**VIGILANTES, INC., et al., Petitioners, Appellants,**

**v.**

**ADMINISTRATOR OF WAGE AND HOUR DIVISION, U.S. DEPARTMENT OF LABOR, et al., Respondents, Appellees.**

**No. 91–1809.**

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1992.

Decided July 9, 1992.

---

George E. Cranwell with whom Cranwell & O'Connell, Arlington, Va., was on brief for petitioners, appellants.

Carol Arnold with whom David S. Fortney, Deputy Sol. of Labor, Monica Gallagher, Associate Sol., William J. Stone, Counsel for Appellate Litigation, Patricia M. Rodenhausen, Associate Regional Sol., Washington, D.C., Daniel Lopez–Romo, U.S. Atty., and Fidel Sevillano, Asst. U.S. Atty., Hato Rey, P.R., were on brief, for respondents, appellees.

Before TORRUELLA, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Vigilantes, Inc., a government contractor, and its president, Angel Pedrosa appeal from the dismissal, as a result of cross-motions for summary judgment, of their petition to overturn a final decision and order of the Deputy Secretary of Labor (Secretary) under the McNamara–O'Hara Service Contract Act (SCA).[1]

## Background

The SCA requires independent contractors who perform service contracts for the

1. 41 U.S.C. § 351 et seq.

federal government to meet certain labor standards. The independent contractor is required to pay its employees certain minimum wages and fringe benefits and to meet certain minimum standards of safety in working conditions.[2] The failure of a contractor to comply with the SCA and the regulations promulgated thereunder [3] may result in liability and debarment from contracting with the government for three years.[4]

Pursuant to the set aside program for minority contractors of Section 8(a) of the Small Business Act,[5] Vigilantes was awarded ten contracts to provide security guard services to the Federal Aviation Administration (FAA) and the General Services Administration (GSA) in Puerto Rico and the United States Virgin Islands for the period beginning either September 1 or October 1, 1977 and ending May 1, 1982.[6]

On September 20, 1981, the Department of Labor (DOL) filed a complaint against Vigilantes and its president, Angel Pedrosa, initially charging them with failing to pay service employees the minimum wages and fringe benefits mandated by the SCA, or those provided in the collective bargaining agreement, and failing to keep proper records of employment pursuant to 29 C.F.R. § 4.6(g). The complaint was amended in 1984 to include an allegation that Vigilantes failed to pay certain service employees overtime pay as required under the Contract Work Hours and Safety Standards Act.[7] Based on these violations, the DOL claimed that appellants were not only liable for the amounts owed, but that they should also be barred from contracting with the government pursuant to Section 5(a) of the SCA.[8]

### The Administrative Law Judge's Decision

Vigilantes' first contract with the FAA became effective on October 1, 1977. The Administrative Law Judge (ALJ) found that prior to entering into that contract, Vigilantes, through its president, Angel Pedrosa, was aware of the existence of a collective bargaining agreement between the predecessor contractor and the Industrial, Technical and Professional Employees Division of the National Maritime Union of America (the Union). It is undisputed that the predecessor contractor and the Union knew, by "informal notification," by November of 1976 that the predecessor would not be awarded a renewal of the contract since it had been set aside for award to a minority contractor pursuant to Section 8(a) of the SBA. Nevertheless, the predecessor contractor and the Union agreed on July 29, 1977 to a supplemental collective bargaining agreement establishing a higher wage rate to become effective the day after the predecessor's contract with the FAA would expire. This supplemental agreement provided for a twenty cent raise in the hourly rate to $3.20, with substantial fringe benefits.

Section 4(c) of the SCA provides in pertinent part:

No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages

---

2. 41 U.S.C. § 351(a)(1), (2), (3).

3. 29 C.F.R. § 4.1 *et seq.*

4. 41 U.S.C. § 354(a).

5. 15 U.S.C. § 637 *et seq.*

6. These tripartite agreements were between the government agencies as the contracting agencies, the Small Business Administration as the contractor and Vigilantes as the sub-contractor.

7. 40 U.S.C. § 327 *et seq.*

8. Section 5(a) provides in pertinent part:

The Comptroller General is directed to distribute a list to all agencies of the Government giving the names of persons or firms that the Federal agencies or the Secretary have found to have violated this chapter. Unless the Secretary otherwise recommends because of unusual circumstances, no contract of the United States shall be awarded to the persons or firms appearing on this list ... until three years have elapsed from the date of publication of the list containing the name of such persons or firms.

41 U.S.C. § 354.

and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits *provided in a collective-bargaining as a result of arm's-length negotiations,* to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided,* That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

41 U.S.C. § 353(c) (initial emphasis supplied).

Under the literal terms of Section 4(c), Vigilantes as successor contractor under the 1977 amended contract appears to have been required to pay its employees $3.20 per hour. In the notice of award of contract given to Vigilantes by the FAA, reference was made to the predecessor collective bargaining agreement, but neither the collective bargaining agreement nor its supplemental version were attached. Instead, the 1977 contract included an erroneous minimum wage determination attachment, which listed the employees' pay rate at $2.45 per hour, rather than the supplemental collective bargaining agreement's rate of $3.20.

The ALJ concluded that Vigilantes was not bound by its predecessor's collective bargaining agreement because it was not negotiated at "arms-length." The ALJ found that the appropriate wage rate was $2.65 per hour. He further held that with respect to the other contracts Vigilantes had committed violations of the minimum wage fringe benefits provisions of the SCA, including violations for overtime, holiday and vacation pay, and that Vigilantes was liable for the cost of gun permits prior to October 1978 and the expense of obtaining a guard license and renewal of such license. Using Vigilantes' own computation of the SCA violation (except for the

calculation of holiday pay and fringe benefits owed under the Virgin Islands contracts), the ALJ assessed appellants' liability for these violations at more than $70,-000. Notwithstanding his finding that Vigilantes had incurred in several violations in its performance of the ten contracts, the ALJ concluded that debarment of Vigilantes was unwarranted because Vigilantes' violations were not the result of "intentional wrongdoing" and Vigilantes made good faith efforts to correct errors when notified of them.

*The Decision of the Secretary*

The DOL filed a petition with the Secretary for review of the ALJ' decision. The Secretary reversed both findings. As to the first he held that in considering the Section 4(c) issue, the ALJ failed to consider the implementing regulation, 29 C.F.R. § 4.6(d)(2), which provided, in 1978,[9] in pertinent part:

If this contract succeeds a contract, subject to the Service Contract Act of 1965 as amended, under which substantially the same services were furnished and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, then in the absence of a minimum wage attachment for this contract neither the contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work less than the wages and fringe benefits, provided for in such collective bargaining agreements, to which such employee would be entitled, if employed under the predecessor contract.... No contractor or subcontractor under this contract may be relieved of the foregoing obligation unless the limitations of § 4.1c(b) apply or *unless the Secretary of Labor or his authorized representative determines that the collective bargaining agreement* applicable to service employees employed under the predecessor contract *was not entered into as a result of arms-length negotiations,* or finds, after a hearing as provided in Labor Depart-

9. In current form it is more favorable to the Secretary.

ment regulations, 29 C.F.R. § 4.10, that the wages and fringe benefits provided for in such an agreement are substantially at variance with those which prevail for services of a character similar in the locality.

29 C.F.R. § 4.6(d)(2) (emphasis supplied.) According to the Secretary, Vigilantes had the burden of requesting a hearing and since they never sought to have the Secretary determine that the collective bargaining agreement at issue was not entered into after arms-length negotiation, they "were not relieved of their statutory obligation to pay the $3.20 per hour wage rate provided in the collective bargaining agreement."

The Secretary further held that the ALJ erred in concluding that appellants had met their burden of establishing the existence of "unusual circumstances" to warrant relief from the debarment sanction as required by the implementing regulation, 29 C.F.R. § 4.188(b)(3)(i). Although he found no history of repeated violations of the Act, he concluded that Vigilantes' violations were serious in nature, involving a significant amount of money and affecting many employees.

### The District Court's Opinion

Vigilantes sought review of the Secretary's Final Decision in the United States District Court for the District of Puerto Rico, asserting that the Secretary's conclusion that Vigilantes was bound by the wage rates set forth in their predecessor contractor's collective bargaining agreement and his order debarring Vigilantes pursuant to Section 5(a) of the SCA were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In accordance with Section 4(a) of the SCA, the district court applied the "preponderance of the evidence" standard and affirmed the Secretary's decision in all respects. 769 F.Supp. 57.

10. *See, also,* 41 U.S.C. § 2(a).

11. Vigilantes now says that the $2.45 attachment was a determination that $3.20 was not an arms-length bargain. Passing the lateness of

### The Proper Wage Rate for the 1977 Contract

■■■■ At the outset, we emphasize that our focus in this opinion is twofold. First, we examine only a 1977 contract—one out of ten contracts—to determine whether the predecessor's collective bargaining agreement's wage rate was applicable. Later in the opinion we focus on all of the ten contracts to determine whether Vigilantes should be relieved from debarment.

Mindful of the italicized portion of Section 4(c), *ante*,[10] the ALJ approached the matter of arms-length as a question of fact. He concluded, largely because the twenty cents increase was for the final year of the contract that began only when Vigilantes was to take over and therefore did not affect its predecessor who had done the negotiating, that the predecessor was unconcerned and carefree in its bargaining. He failed to note that to decide on such an inference would, in effect, make meaningless the Union's right to negotiate for the second year, unless, conceivably, they were negotiating downward. He also, in selecting $2.65, did not explain how his conclusion invalidated the $3.00 that the predecessor had accepted for itself the first year, and which remained to the contract if the amendment was void.

More to the point, the ALJ did not note the emphasized portion of 29 C.F.R. § 4.6(d)(2), *ante*, that provides that a successor contractor shall not be relieved of its predecessor's bargaining agreement,

> unless the Secretary of Labor or his authorized representative determines that the ... agreement ... was not entered into as a result of arms-length negotiations.

The question was for the Secretary, who had made no such determination,[11] and there was no issue for the ALJ at all.

This makes good sense. It should not be open to a successor contractor to take it on

this claim, it does not answer the $3.00 figure, which no one could think not arms-length, or otherwise explain where $2.45 had come from.

its own to decide that his predecessor's agreement was not properly negotiated and leave all in suspense until there has been a complaint and a trial before an ALJ.[12] Rather, there is an immediate remedy: apply to the Secretary.

Vigilantes would have it that, even if duly negotiated, the agreement was not binding on it because of Section 4.6(d)(2).

> If this contract succeeds a contract, subject to the Service Contract Act of 1965 as amended, under which substantially the same services were furnished and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, *then in the absence of a minimum wage attachment for this contract* neither the contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work less than the wages and fringe benefits provided for in such collective bargaining agreement....

(Emphasis supplied.) The contention is that since there was a minimum wage attachment the contractor "shall pay ... less than the wages and fringe benefits...." Passing the fact that the $2.45 minimum wage attachment was a ringer—the true Puerto Rico minimum wage was $2.65, we believe this was not a lawful negative pregnant, but a pregnancy that would produce an illegitimate result: by telling a contractor what is the minimum wage you are telling him that he must pay only that, viz., less than the collective bargaining agreement. Surely diminishing bargaining agreements is not the overall purpose of the SCA. Rather, it is "intended to provide wage and safety protection for employees working under government service." Senate Report (Labor and Public Welfare) 92–1131, *reprinted in* 1972 U.S.C.A.A.N. 3534, 3534 (92nd Cong. 2nd Sess.), *see, also,* Senate Report (Labor and Public Welfare) 798 *reprinted in* 1965 U.S.C.A.A.N. 3737, 3737–38 (89th Cong. 1st Sess.).

If there could be thought to be any such implication in § 4.6(d)(2) it seems fully answered by 29 C.F.R. § 4.165(c).

> (c) The prevailing rate established by a wage determination under the Act is a minimum rate. A contractor is not precluded from paying wage rates in excess of those determined to be prevailing in the particular locality. *Nor does the Act affect or require the changing of any provisions of union contracts specifying higher monetary wages* or fringe benefits than those contained in an applicable determination. However, if a determination for a class of service employees contains a wage or fringe benefit provision which is higher than that specified in an existing union agreement, the determination's provision will prevail for any work performed on a contract subject to the determination.

(Emphasis supplied).

Our dissenting Brother asks what is the purpose of the italicized language in 29 C.F.R. § 4.6(d)(2) if not to raise the inference that appellants claim. We respectfully suggest that he has not properly interpreted the last sentence of § 4.165(c). This applies, we believe, when the collective bargaining agreement calls for a lower wage than the Secretary feels should be the minimum. We agree with the Secretary's conclusion that appellants were bound to respect the terms of the collective bargaining agreement, of which, concededly, they had knowledge, even though a copy was not attached to their contracts, and without regard to the erroneous minimum wage attachment.

A word about our Brother's claim that the DOL was unfair because in a 1978 audit it failed to discover appellants' underpayments. Passing the fact that it does not appear when in 1978 (the bargaining agreement ran only from October 1, 1977 to June 30, 1978) appellants learned of the audit, claiming estoppel against the government carries a heavy burden. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218,

---

**12.** We do not have to remind the parties that the initial ALJ decision here took five years, September 1981 to October 1986, and we are still litigating.

81 L.Ed.2d 42 (1984). Here all Vigilantes did was to persist in paying less wages than it should have. This was no basis for estoppel. Even our dissenting brother is satisfied with the three year penalty, *post*, quite apart from that particular action.

In sum, we cannot agree that stating a minimum wage is to be read as stating a maximum one. We pass, accordingly, to the second issue.

### The Debarment: Vigilantes' Performance Under the Ten Contracts

 The legislative history of the SCA makes clear that debarment of contractors who violated the SCA should be the norm, not the exception, and only the most compelling of justifications should relieve a violating contractor from that sanction. In 1972, the SCA was amended to circumscribe the discretion of the Secretary in granting relief from debarment. *See* 29 C.F.R. § 4.188(b)(2) (citing *Proposed Amendments to the Service Contract Act: Hearings on H.R. 6244 and 6245 Before the Spec. Subcomm. on Labor of the House Comm. on Education and Labor,* 92d Cong., 1st Sess. (1971)). Section 5(a) the SCA provides that, "[u]nless the Secretary recommends otherwise because of unusual circumstances," the service contractor who violates the Act shall be debarred for three years. 41 U.S.C. § 354(a). Although the Act does not define "unusual circumstances," the regulations at 29 C.F.R. § 4.188(b) establish a three part test. Part I asks whether the contractor's violations were "willful, deliberate or of an aggravated nature" or the result of "culpable conduct such as culpable neglect to ascertain whether practices are [or were] in violation" or failure to comply with record-keeping requirements. 29 C.F.R. § 4.188(B)(3)(i). Part II calls for the following prerequisites to be present: a good compliance history, cooperation in the investigation, repayment of moneys due, and sufficient assurances of future compliance. Finally, if the conditions in Part I and II are met, a number of factors are considered to determine whether "unusual cir-

cumstances" are present, bearing on good faith.

We review the Secretary's findings to determine whether a preponderance of the evidence supports his conclusion that Vigilantes should be barred from bidding on government contracts. To his determination that Vigilantes was obligated to pay the wage rate established in the predecessor's supplemental collective bargaining agreement was added the ALJ's findings that Vigilantes' deficiencies under the other contracts were numerous and amounted to more than $70,000. Vigilantes failed to show that the aggravated circumstances of Part I of the debarment test were not present. Assuming that its failure to comply with the labor standards of the SCA was not willful, the violations demonstrate a pattern of culpable neglect. Vigilantes had more than adequate notice that violations of the SCA would result in the debarment sanction; it was investigated in 1978 and notified that failure to comply with the SCA would result in debarment. This early warning was to no avail. Vigilantes failed to comply with the regulations concerning payment of overtime and holiday pay, failed to state separately the basic wage rates and fringe benefits, failed to keep appropriate records prior to 1981, failed to consistently reimburse employees (1) for gun licenses prior to October 1978 and (2) for guard licenses, and failed to compensate employees for vacations. Additionally, the record establishes that Vigilantes did not meet the prerequisites of Part II, one of which is the prompt payment of monies due; it had to be sued in order for DOL to collect. Indeed, after conducting an audit of a payroll disbursement for six of the ten contracts in 1985, Vigilantes' own accountant found that wage "[d]eficiencies appeared for most employees."

The record clearly shows that the ALJ did not apply the "unusual circumstances" test as formulated in Section 4.188(b)(3). Vigilantes operations were fairly sizable, involving hundreds of employees and ten contracts with the FAA and GSA. Each of these contracts specified that the contractor was responsible for complying with the

SCA, including furnishing all equipment needed to perform satisfactorily the armed guard services, yet Vigilantes committed continuous violations of the SCA and its regulations, including deficiencies in the payment of overtime pay, holiday pay, vacation pay, the keeping of adequate records, and the reimbursement for equipment needed to perform the services. We conclude that the Secretary's decision to debar Vigilantes for three years is based on a preponderance of the evidence.

*Affirmed.*

TORRUELLA, Circuit Judge (concurring in part and dissenting in part).

This case involves two related, but ultimately independent issues: (1) the performance of appellant Vigilantes under one contract—the 1977 contract—and (2) its overall performance under ten contracts, including the 1977 contract. I agree with the majority that Vigilantes' overall performance under the ten contracts supports the Secretary's decision to debar Vigilantes. Nevertheless, I believe that in concluding that Vigilantes was compelled to pay a $3.60 wage rate under the 1977 contract, the majority overlooks crucial facts. According to the majority, 29 C.F.R. § 4.6(d)(2) & § 4.165(c) would support the following holding; if a sub-contractor takes over a service contract and it is informed by the agency in charge of administering the Service Contract Act ("SCA")—the Department of Labor ("DOL")—that $2.45 is the proper wage rate to pay under that service contract, the sub-contractor should nevertheless disregard *DOL's determination* and pay another rate.[13] I cannot agree.

I respectfully suggest that the majority has ignored two crucial facts in the administrative record. First, in the 1977 contract, Vigilantes was the sub-contractor and the Federal Aviation Administration ("FAA") was the contractor. This is important because Vigilantes played a secondary role in the negotiating process and both the FAA and DOL informed Vigilantes to pay the $2.45 wage rate. Second, and most important, DOL investigated Vigilantes in 1978 for Fair Labor Standards Act and SCA violations. At the time, DOL found that Vigilantes was in full compliance with the SCA, including the provisions dealing with the payment of a proper wage rate. This investigation raises an issue of basic fairness; how can we say that the Secretary's decision is supported by a preponderance of the evidence when Vigilantes was informed by DOL in 1978—after a full investigation—that by virtue of its payment of the wage rate determined by DOL—$2.45—it was fully complying with the provisions of the SCA?[14]

With all due respect, I believe the majority's analysis reads out of the regulation the following plain language of Section 4.6(d)(2):

> If this contract succeeds a contract, subject to the Service Contract Act of 1965 as amended, under which substantially the same services were furnished and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, *then in the absence of a minimum wage attachment for this contract* neither the contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work less than the wages and fringe benefits... *Id.* (emphasis added).

---

**13.** In this sense, the majority's conclusion that "[i]t should not be open to a successor contractor to take it on its own to decide that his predecessor's agreement was not properly negotiated and leave all in suspense until there has been a complaint and a trial before an ALJ," Op. at 1416–17, is a sound one. Yet it has no bearing on the facts of this case because Vigilantes was informed by both the DOL and the FAA that it should pay the wage determined in the attachment. As the majority later recognizes, instead of receiving a copy of the collective bargaining agreement, Vigilantes was given "an erroneous minimum wage attachment." Op. at 1417.

**14.** Contrary to the majority's implicit characterization of my views, I do not claim that DOL was estopped from bringing forth claims under the 1977 contract. Op. at 1418. Rather, the fact that DOL's investigation in 1978 concluded that Vigilantes was paying the proper wage rate is another fact supporting Vigilantes' claim that the Secretary's decision is not supported by a preponderance of the evidence.

The majority attributes no significance to this clear language. Regardless of how we characterize the underlined language, it seems to me that it is unambiguous and we should apply it.[15] The dispositive issue here is whether in light of Section 4.6(d)(2) there are sufficient facts to show that DOL's grossly negligent administration of the SCA—unless we choose to ignore that DOL gave Vigilantes the wage rate for the 1977 contract and informed Vigilantes that it was the proper wage more than once—led Vigilantes to pay a lower wage rate.

The majority's finds 29 C.F.R. § 4.165(c) conclusive. Section 4.165(c) provides:

> The prevailing wage rate established by a wage determination under the Act is a minimum rate. A contractor is not precluded from paying wage rates in excess of those determined to be prevailing in the particular locality. *Nor does the Act affect or require the changing of any provisions of union contracts specifying higher monetary wages or fringe benefits than those contained in an applicable determination. . . .*

(emphasis added). The majority relies on Section 4.165(c) to conclude that a subcontractor is compelled to second-guess the directives provided by DOL relative to wages. The language of Section 4.165(c), however, merely restates the basic principle that the minimum wage determination does not preclude the payment of higher wages by means of a *post-wage determination* union contract. More importantly, at the time the 1977 contract was negotiated, other regulations then in effect showed that an inexperienced sub-contractor like Vigilantes was entitled to rely on the wage determinations provided by DOL. 29 C.F.R. § 4.164(a) & (c) (1977), which preceded Section 4.165, provided:

> § 4.164 *Making the determinations and informing contractors*
>
> (a) *Information considered.* The minimum monetary wages and fringe benefits set forth in determinations of the Secretary are based on information as to wage rates and fringe benefits in

effect at the time the determination was made. The Department considers all pertinent information. . . . *The determinations may be based on the wage rates and fringe benefits contained in union agreements* where such have been determined to prevail in a locality for a specified occupational group.

> \* \* \* \* \* \*

> (c) *Informing contractors of applicable determinations.* Contractors and subcontractors on contracts subject to the Act are apprised of the Secretary's determinations applicable at the time of the award by specification in the contract of the determined wage rates and fringe benefits. . . . Prospective contractors are advised, in the invitations for bids or negotiation papers issued by the contracting agency, of the minimum monetary wages and fringe benefits required under the most recent applicable determinations of the Secretary for service employees who will perform the contract work.

(emphasis added). Sections 4.164(a) & (c) conclusively show that the Secretary's decision is not supported by a preponderance of the evidence. As the ALJ concluded: "[Vigilantes] received contradictory, incorrect, or no information in many instances; and that must be taken into account in evaluating [Vigilantes'] performance." A provision of the SCA further supports Vigilantes' argument that DOL misled it by providing an erroneous wage determination. Section 2(a) provides that every contract for services entered into by the United States shall contain:

> (1) *A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder, as determined by the Secretary, or his authorized representative,* in accordance with prevailing rates for such employees in the locality, or, where a collective-bargaining agreement covers any such service em-

---

**15.** In fact, the presence of a wage determination attachment here renders the issue of whether the agreement was negotiated at arm's length or not of little, if any, significance.

ployees, in accordance with the rates for such employees provided for in such agreement, including prospective wage increases provided for in such agreement as a result of arm's-length negotiations. 41 U.S.C. § 351(a) (emphasis added). Neither the district court nor the majority mention Section 2(a), although this Section—together with the other regulations discussed previously—conclusively show that the wage determination attached to the 1977 contract would have led a reasonable contractor to believe that he or she was obliged to pay the wage rate as established by DOL.[16]

The goal of SCA is to protect labor. But that goal has no relevance in this case; the question here is who should bear the responsibility for the mistakes made by DOL? It seems axiomatic under basic principles of administrative law that a SCA contractor should be penalized only for not following DOL's determinations. If DOL—the agency responsible for the administration of the SCA—informs a sub-contractor that it is complying with the statute, should the sub-contractor go out of its way to question the agency's determination?

I respectfully dissent.

---

**16.** At oral argument the government conceded that it had an obligation to include a wage determination attachment to the 1977 contract, and that in this case, they included an erroneous wage rate determination.