SUMMITT INVESTIGATIVE SERVICE, INC., et al., Plaintiffs,

v.

Alexis HERMAN, Secretary, Department of Labor, Defendant.

No. Civ.A. 97–01008 (CKK).

United States District Court, District of Columbia.

Sept. 30, 1998.

---

**18**

Raymond Fioravanti, Epstein, Becker & Green, P.C., Washington, DC, for plaintiffs.

Michael C. Johnson, U.S. Attorney's Office, Washington, DC, for defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Plaintiffs Summitt Investigative Services, Inc. ("Summitt") and its President, Harold Wigfall, and Vice President, Michael B. Holiday, bring suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), to challenge the Secretary of Labor's decision to debar them for three years from bidding on government contracts. Pending before the Court are the parties' cross-motions for summary judgment and separate briefs that address whether Count VII of the Complaint is properly before the Court. Having carefully reviewed the pleadings, arguments, and the well-developed administrative record, the Court grants the Secretary's motion for summary judgment. Moreover, the Court concludes that Plaintiffs failed to exhaust their administrative remedies with respect to Count VII, and that no exception to the doctrine of exhaustion permits them to bypass the administrative process.

## I. BACKGROUND

On February 23, 1993, the Federal Aviation Administration ("FAA") awarded contract number DTFA03–93–C–000015 to Summitt. *See* 5 Administrative Record [hereinafter A.R.] 1745. Under the terms of the agreement, from March 1, 1993 through September 30, 1993, Summitt was to provide security services for the FAA Technical Center and its associated facilities in New Jersey in consideration for $383,134.92. *See*

*id.* Thereafter, the contract could be extended annually for as many as four years at the rate of $656,802.56 per annum. *See id.* The FAA exercised its option to renew the contract on September 8, 1993. *See id.* At all times, the contract was subject to the provisions of the Service Contract Act, 41 U.S.C. § 351 *et seq.*, and the Contract Work Hours and Safety Standards Act (CWHSSA), 40 U.S.C. § 327 *et seq.*

Summitt's inability to meet its payroll surfaced during the contract's first pay period when several paychecks issued to Summitt's employees bounced. *See* 3 A.R. 747; Pls.' R. 108(h) Response to Def.'s Statement of Material Fact Not in Dispute [hereinafter Pls.' R. 108(h) Response] at 1 (conceding several paychecks bounced during first pay period). Mario Maccarone, the FAA Contracting Officer, issued a cure notice, to which Summitt responded the next day with assurances that its checks would not bounce again. *See* 3 A.R. 750. Nonetheless, the Department of Labor's Wage and Hour Division received complaints from employees that their paychecks continued to bounce and that Summitt had been making improper deductions for a "uniform deposit." *See* 2 A.R. 259, 326, 361– 62; Pls.' R. 108(h) Response at 1.

Summitt's financial condition reached its nadir in late September and early October of 1993. For the October 8, 1993 payroll, at least eight, and as many as half of the paychecks issued to Summitt's twenty-six employees bounced. *See* 5 A.R. 1614 (indicating that eight guards were issued checks returned for insufficient funds); 3 A.R. 757 (Maccarone testifying that more than half of the paychecks for this period bounced). Maccarone issued a cure notice that warned Summitt that it risked incurring an immediate default on the contract. *See* 5 A.R. 757. In a meeting with Summitt's Vice President, Michael B. Holiday, Maccarone negotiated a no-fault termination of the contract in which Maccarone agreed to release $56,000 on October 27, 1993 with the understanding that Summitt would use the money to pay its workers. *See* 3 A.R. 757–59, 906; Pls.' R. 108(h) Response at 4 (failing to contest the Secretary's Rule 108(h) Statement with respect to this fact). Although there is some

dispute as to where exactly Summitt spent this $56,000, it appears that rather than paying its own employees, Summit "spent it someplace else." 5 A.R. 759 (testimony of Maccarone); Pls.' R. 108(h) Response at 4. On November 2, 1993, Summitt's employees walked off the job when the corporation failed to tender any paychecks to its employees. *See* 4 A.R. 1472–76, 3 A.R. 928–30; Pls.' 108(h) Response at 4 (conceding paragraphs 25–27 of Defendant's Rule 108(h) Statement). The FAA promptly notified Holiday that Summitt's failure to provide security services for the Technical Center on November 2, 1993 constituted an immediately effective default on the contract. *See* 4 A.R. 1472–76, 3 A.R. 928–30; Pls. R. 108(h) Response at 4.

The Department of Labor's Wage and Hour Division initiated administrative proceedings before an Administrative Law Judge (ALJ) to recover back wages owed to Summitt employees. *See* 1 A.R. 1–6, 23–29. After a two-day hearing, the ALJ issued a decision in which he found that Summitt, Wigfall, and Holiday violated the SCA and the CWHSSA. The ALJ further ordered Summitt and its principal officers to repay its employees $62,091.25. *See* 5 A.R. 1759. Despite finding that Summitt contravened the SCA and the CWHSSA, the ALJ concluded that "unusual circumstances" existed to spare Summitt, Wigfall, and Holiday from debarment. *See* 5 A.R. 1760–63. On administrative appeal, the Administrative Review Board ("ARB") reversed; it disagreed that there were any "unusual circumstances" to justify relieving the Plaintiffs from the debarment list. *See* 5 A.R. 1848–61. Plaintiffs, after retaining new counsel, petitioned the ARB for reconsideration. *See* 5 A.R. 1865–92. Having never raised the issue before the ALJ or the ARB, the Plaintiffs in their petition for reconsideration suggested a new ground for finding "unusual circumstances"—that the Department of Labor violated the Fifth Amendment by selectively enforcing the SCA's debarment provisions against small disadvantaged businesses, of which Summit is one. The ARB denied the petition for reconsideration. *See* 5 A .R. 1909–12. With three pithy sentences, the ARB rejected the Plaintiffs' newly minted selective enforcement argument. Noting that Summitt neglected to raise this issue until its motion for reconsideration, the ARB found "absolutely no support for this allegation in the record," 5 A.R.1912, and rejected it accordingly. Plaintiffs filed the above-captioned case in this Court on May 7, 1997.

## II. DISCUSSION

### A. *The Service Contract Act*

The McNamara–O'Hara Service Contract Act of 1965, 41 U.S.C. § 351 *et seq.*, mandates that those who contract to provide services to the United States must remunerate their employees with minimum wages and fringe benefits prescribed by the Secretary of Labor. 41 U.S.C. § 351(a)(1)–(2). In its attempt to regulate this contractual relationship, Congress imposed a severe sanction for those companies that deviate from the SCA's requirements: debarment from bidding on government contracts for three years. *See* 41 U.S.C. § 354(a). Debarment is mandatory "[u]nless the Secretary otherwise recommends because of unusual circumstances." *Id.*

Although debarment may often be a "severe penalty which may have serious economic impact upon a business," *Mastercraft Flooring, Inc. v. Donovan,* 589 F.Supp. 258, 263 (D.D.C.1984), the Act's legislative history, coupled with its 1972 amendments, demonstrate that "debarment of contractors who violate[ ] the SCA should be the norm, not the exception, and only the most compelling of justifications should relieve a violating contractor from the sanction." *Vigilantes, Inc. v. Administrator of Wage and Hour Div.,* 968 F.2d 1412, 1418 (1st Cir.1992). Congress recognized that employees of government-service contractors historically "tended to be among the lowest paid people in the economy, and they tended not to be organized by trade unions." House Comm. on Educ. & Labor, Special Subcomm. on Labor, Hearing on H.R. 6244 and H.R. 6245, 92d Cong. 3 (1971) (Statement of Rep. James G. O'Hara) [hereinafter Hearing]. Because of the important interests at stake, Congress found that simply requiring violating contractors "to pay what they should have been paying to begin with," *id.*, inadequately deterred and punished such employers. Accordingly, the

1972 amendments were drafted to ensure that § 354(a)'s debarment penalty, which until the amendments had been "the exception rather than the rule," would be "virtually automatic" and "expeditiously and rigorously applied." House Special Subcomm. on Labor, Comm. on Educ. & Labor, The Plight of the Service Workers Under Government Contracts 12–13 (Comm. Print 1971).

Although cognizant of government contractors' rights, Congress found that the "rights of the workers performing these contract services are no less important, and deserve no less vigorous protection." *Id.* To that end, the statutory safety valve of "unusual circumstances" was to apply only to "situations where the violation was a minor one, or an inadvertent one" or where disbarment would be "wholly disproportionate to the offense." Hearing, *supra,* at 3. Maintaining fidelity to congressional design, this Circuit has held that debarment is inappropriate only where the violations are insignificant or minor because "debarment against innocent and petty violations was not intended." *Federal Food Serv., Inc. v. Donovan,* 658 F.2d 830, 834 (D.C.Cir.1981). Stated more bluntly, a court from this jurisdiction has observed that the unusual circumstances exception is "not intended to permit the unbounded exercise of bureaucratic benevolence." *A to Z Maintenance Corp. v. Dole,* 710 F.Supp. 853, 855 (D.D.C.1989).

Despite its importance, the term "unusual circumstances" is not defined in the SCA. The Secretary of Labor, however, has promulgated regulations that set forth a three-part test to assess factors that may constitute unusual circumstances. *See* 29 C.F.R. § 4.188(b). While the determination is to be made on a case-by-case basis, *see id.* § 4.188(b)(1), the burden rests with the violator to demonstrate that such circumstances exist. *See id.* The first prong of this test forecloses a contractor from availing itself of the exception if its conduct was "willful, deliberate or of an aggravated nature or where the violations are a result of culpable conduct such as culpable neglect to ascertain whether practices are in violation, culpable disregard of whether they were in violation or not, or culpable failure to comply with recordkeep-ing requirements." *Id.* § (b)(3)(i). Lumped under this first heading as well are instances in which the contractor has manifested a history of violations or repeated violations. *See id.* If the contractor's actions reflect none of these aggravating considerations, then the contractor, to prevail on the second prong, must demonstrate that it satisfies the following prerequisites: a good compliance history, cooperation in the investigation, repayment of money due and assurances of future compliance. *See id.* § 4.188(b)(3)(ii). Finally, the decisionmaker should consider whether there have been any previous investigations, whether there were any record-keeping violations that impeded the investigation, whether liability depended on the resolution of a bona fide legal issue of doubtful certainty, the violator's efforts to comply, the nature, extent, and seriousness of past and present violations, the impact on employees, and whether money due was promptly paid. *See id.*

### B. *Standard of review*

The Court reviews the ARB's decision to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although an agency's exercise of discretion normally must be supported by substantial evidence, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Secretary's decision to bar a contractor must be supported by a preponderance of the evidence. *See* 29 C.F.R. § 4.189; *Federal Food Serv.,* 658 F.2d at 833; *A to Z,* 710 F.Supp. at 856 n. 9. While different from the substantial-evidence rubric, the preponderance-of-the-evidence standard is not an "invitation" for the Court to substitute its judgment for that of the agency. *See Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988). Rather, it "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). Under this

standard, the party challenging the administrative decision must "at least take on the burden of persuading the court that [the Board] was wrong." *Kerkam*, 862 F.2d at 887.

### C. *Factors identified by Summitt do not constitute unusual circumstances*

Summitt maintains that the FAA and/or the Department of Labor so contributed to their financial plight as to relieve them from debarment. Specifically, the corporation and its officers identify five events of alleged agency malfeasance that undermined Summitt's ability to meet payroll demands. Despite Summitt's efforts to locate a scapegoat, the ARB's conclusion that the actions of the FAA and the Department of Labor do not relieve Summitt from debarment is supported by a preponderance of the evidence and is not arbitrary or capricious.

#### 1. *Uniforms*

■ The contract obligated Summitt to furnish, at its own cost, uniforms to all of its employees. Section 4.3 of the contract, however, provided: "All uniforms must be approved by the COTR [Contracting Officer's Technical Representative] *prior to purchase*." 5 A.R. 1748 (emphasis added). The ALJ concluded that, despite section 4.3's clear admonition, "Summitt bid the contract on the assumption that its stock uniforms would be approved by the COTR." 5 A.R. 1749. Contrary to expectation, the COTR rejected Summitt's stock uniforms. The price for this miscalculation was $12,000 to purchase new uniforms that garnered the COTR's assent. As Holiday conceded during the administrative hearing, the outlay for new uniforms "was a cost that we had not considered in bidding on this contract." 5 A.R. 1749.

Summitt blames the COTR in part for its financial problems because of what it perceives to be the arbitrary rejection of its uniforms. This argument misses the mark. The contract could not state with plainer language that the COTR reserves the right to approve all uniforms with which a contractor intends to furnish its employees. When Summitt bid on the contract, it had to recognize that the COTR might reject its stock uniforms. By ignoring this contingency, Summitt unilaterally excised section 4.3's literal language from the contract and left itself vulnerable to a significant and immediate cash shortage.

Summitt essentially argues that it was justified in assuming that the COTR would approve its stock uniforms because they were substantially identical to the uniforms that the FAA had furnished to its in-house guards. To be sure, the record seems to indicate that the one significant difference between the two uniforms was the presence of a maroon stripe that ran down the side of each pant leg. *See* 5 A.R. 1749. Summitt maintains that it was arbitrary and capricious for the COTR to reject its uniforms based on something as minor as incorrect striping. The record, however, is simply too sparse for this Court to conclude that the COTR acted arbitrarily and capriciously. The burden rests with Summitt to marshal evidence to support its claim that the COTR acted in bad faith. Absent such evidence, all that remains is the contract's plain-language condition: "All uniforms must be approved by the COTR prior to purchase." That Summitt chose instead to gamble on COTR approval, while concomitantly failing to prepare for a contrary result, dramatizes the very danger that Congress sought to deter by enacting the SCA and its debarment provision: to prevent service contractors from tendering unrealistically low, financially dubious bids that ultimately paralyze them from paying their employees.

#### 2. *Fringe-benefits plan*

While the contract required Summitt to provide its employees with fringe benefits, it permitted Summitt to choose whether it wished to implement a cash or in-kind plan. Initially, Holiday assumed that Summitt would offer the less-costly in-kind fringe-benefits package. *See* 5 A.R. 1748. Indeed, before the ALJ, "Holiday testified that he had bid on the contract with the expectation that the employees would take the benefits plan that he offered and he would not have to pay the more costly hourly fringe benefit rate." 5 A.R. 1784. During the first month

of the contract, however, Summitt's employees circulated and forwarded a petition to Holiday expressing that they "preferred to be paid at the fringe benefits hourly rate as part of their wages." 5 A.R. 1748. Unlike the in-kind plan that Summitt had contemplated, the cash program saddles an employer with greater financial liabilities, including increased workers' compensation insurance, liability insurance, unemployment insurance, and Social Security payments. *See* 5 A.R. 1748.

██ Summitt eventually adopted the costlier cash plan—a decision from which they trace a portion of their financial shortfalls. With an argument akin to "the Devil made me do it," Summitt blames the FAA and the Department of Labor for its own volitional decision to adopt the cash fringe-benefits plan. According to Holiday, the COTR "strongly suggested" that Summitt remunerate its employees with fringe-benefits as part of their wages. In his own words, Holiday explained, "basically what he [the COTR] said to me was, if the employees aren't happy with the way things are going, then that makes us unhappy, and then in turn, we have to make you unhappy." 5 A.R. 1748.

The Court finds that the ARB's decision with respect to the fringe benefits is supported by a preponderance of the evidence and is neither arbitrary nor capricious. Stripped of its hyperbole, the COTR's statement to Holiday amounted to nothing more than the rather unremarkable proposition that the FAA and the Department of Labor care that service contractors' employees are content. Although it clearly signaled the agency's dissatisfaction with Summitt's proposed fringe-benefits package, the COTR's statement amounts to nothing approaching duress or coercion. The record is bereft of any evidence indicating that Summitt lacked the autonomy to proceed with its prior plan to offer an in-kind fringe-benefits plan. The following colloquy between Holiday and Summitt's counsel during the administrative hearing underscores the absence of any FAA "directive" to pay fringe benefits in cash:

Q: Now was there anyone else at FAA besides the contracting officer, Mr. Maccarone, who told you that you had to pay the employees in cash as opposed to the fringe benefit package?

A: *Well, he actually didn't say you have to pay it.* He strongly suggested that in order to keep them happy, we pay them out in the dollars.

5 A.R. 1858 (emphasis added). Summitt once again grievously miscalculated when it "bid on the contract with the expectation that the employees would take the benefits plan that [Summitt] offered." 5 A.R. 1748. The ARB's decision is not arbitrary and capricious.

3. *Overpayments on fringe benefits*

██ Equally specious, Summitt characterizes its own misunderstanding of how to calculate fringe-benefits on overtime hours as a "directive" from the FAA. Although neither the SCA nor governing regulations required Summitt to pay time-and-one-half the cash fringe benefit rate for overtime hours, *see* 29 C.F.R. § 778.7, Summitt nonetheless compensated its employees at this rate. Significantly, at no time did an FAA official order or otherwise intimate that Summitt had to adopt this pay schedule. In fact, it was FAA's silence that Summitt finds objectionable. The record indicates that the Administrator's investigator, Patrick Reilly, was aware that Summitt was paying its employees at the time-and-one-half rate on fringe benefits. *See* 5 A.R. 1859, 5 A.R. 1759. Reilly, however, did not understand his job to encompass a duty to instruct Summitt on how to pay its employees less. As he explained Summitt's misconception of the fringe-benefit overtime rate and his duty to notify them of it: "It was not a violation of the Service Contract Act. So, I would not have advised him of anything if it looked all right." 5 A.R. 1759.

The ARB's conclusion with respect to this issue is not arbitrary and capricious. As the ARB held,

[t]he SCA is a minimum wage law. It does not prohibit a contractor from paying wages or fringe benefits higher than those contained in the applicable wage determination. Thus, Reilly's description of his job duties as not including an obligation to tell the contractor that he could pay less, is

accurate. Although under these circumstances we question Reilly's failure to correct Summitt's misunderstanding, we cannot draw any inference from his failure to do so that supports a finding of unusual circumstances.

5 A.R. 1859. Buttressed by no legal citation, Summitt conclusorily heralds Reilly's silence as "wrong, and ... constitut[ing] a breach of the Government's duty of cooperation and fair dealing." Pls.' Mot. for Summ.J. at 14. Yet this Court cannot condemn the ARB's formulation of Reilly's job and his attendant duties as arbitrary and capricious.

### 4. *Wage determination misclassification*

■ Summitt claims that the FAA and the Department of Labor failed to correct the contract's wage determination to reflect the lower rates contained in the bid solicitation. Prominently centered across the top of this statement in the bid solicitation, however, was the following cautionary qualification: "THIS STATEMENT IS FOR INFORMATION ONLY: IT IS NOT A WAGE DETERMINATION." 5 A.R. 1855 (capitals in original). The actual wage determination appended to the contract contained only three wage classifications: Court Security Officer, Guard I, and Guard II. This contrasted with the six classifications reprinted in the bid solicitation's statement.

Under the Department of Labor's regulations, it is manifestly clear that the "minimum monetary wages and fringe benefits for service employees ... will be set forth in wage determinations issued by the Administrator." 29 C.F.R. § 4.3(a). Thus, even were one to eschew the conspicuous admonition printed on the bid solicitation's statement, a contractor minimally initiated with Labor regulations could offer no excuse for failing to appreciate that only the Administrator's wage determination matters when calculating wages. While the ARB accepted the Plaintiffs' characterization of the wage determination as boasting a "glaring discrepancy" with the bid solicitation's statement, *see* 5 A.R.1909, such a concession does not alter the ARB's ultimate conclusion. First, a formal discrepancy—whether it be glaring or latent—between an authoritative document and a non-binding, advisory document is not really a substantive discrepancy at all. To the extent the wage determination and the bid solicitation's statement spawned a seeming contradiction, it should have been obvious to all which governed.

■ Yet putting that aside, the ARB did not act arbitrarily and capriciously when it held that "any confusion that did exist regarding the accuracy of the wage determination should have been raised by Summitt prior to contract award." 5 A.R. 1857. Regulations promulgated pursuant to the SCA establish a process through which contractors may challenge the accuracy or completeness of a wage determination prior to bidding or the award of a contract. Moreover, it is just this type of device that a contractor has a duty to employ when the contract presents a patent or glaring ambiguity. As the Federal Circuit has recently held, the well-recognized patent-ambiguity doctrine provides that "a patent ambiguity in a government contract 'raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation.'" *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474 (Fed.Cir.1997) (quoting *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985)). Upsetting the general *contra proferentem* rule of construing ambiguities against the drafter, the patent-ambiguity doctrine imposes a duty that "requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid." *Id.* at 1475; *see also Reliable Bldg. Maintenance Co. v. United States*, 31 Fed.Cl. 641, 644 (1994); *Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 649 (Ct.Cl.1982). Of interest, courts have deemed "glaring" ambiguities to be synonymous with "patent" ambiguities. *See, e.g., Solar Turbines Int'l v. United States*, 3 Cl.Ct. 489, 497 (1983); *Newsom*, 676 F.2d at 650; *see also Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501, 504 (Cl.Ct.1963) (holding that a patent ambiguity exists where there is "an obvious omission, inconsistency, or discrepancy of significance").

Summitt acknowledges that courts have invoked the patent-ambiguity doctrine to bar contractors from seeking reimbursements

from the government, but it urges the Court not to extend the doctrine to justify debarring a contractor. On one level, Summitt is correct in identifying this distinction. It is, however, a distinction that bears little relevance to this Court's task. Summitt's failure to inquire about the discrepancy between the wage determination and the bid solicitation's statement has never been asserted as a basis to *debar* them. Had they paid their employees, Summitt obviously would not have been debarred whether it chose to clarify this ambiguity or not. Instead, Summitt's failure to avail itself of the regulatory procedures for challenging "glaring discrepancies" is relevant because it militates against a finding of *unusual circumstances*. Where a putative "glaring discrepancy" exists, and where regulations provide a contractor with a viable mechanism through which to clarify and amend that discrepancy, courts should be reticent to conclude that unusual circumstances excuse the contractor's SCA violations stemming from such "glaring discrepancies." Yes, administrative inefficiency plagued Summitt's eventual overtures to clarify and amend the wage determination, but only Summitt is to blame for lacking the foresight to recognize the "glaring discrepancy" sooner. The ARB's conclusion was supported by a preponderance of the evidence and was not arbitrary or capricious.

### 5. *Vacation vesting*

■ Finally, Summitt claims that the ARB "committed an error of law by requiring that Summitt allow employees to take a vacation at the time those benefits vest." Pls.' Mot. for Summ.J. at 23. All parties agree that, under the SCA's implementing regulations, an employee's vacation benefits vest after one year on the job. *See* 29 C.F.R. § 4.173(c)(2). At issue is whether the ARB acted arbitrarily and capriciously when it held that Summitt had to honor an employee's request for paid vacation once those benefits vested. The regulations provide a clear answer to this as well:

The individual employee's anniversary date (and each annual anniversary date of employment thereafter) is the reference point for vesting of vacation eligibility, but does not necessarily mean that the employee must be given the vacation or paid for it on the date on which it is vested. The vacation may be scheduled according to a reasonable plan mutually agreed to and communicated to the employees. A "reasonable" plan may be interpreted to be a plan which allows the employer to maintain uninterrupted contract services and allows the employee some choice, by seniority or similar factor, in the scheduling of vacations. However, the required vacation must be given or payment made in lieu thereof before the next anniversary date, before completion of the current contract, or before the employee terminates employment, whichever occurs first.

29 C.F.R. § 4.173(c)(2). Summitt myopically reads the first and last sentences of § 4.173(c)(2) to the exclusion of the intermediate portions. Before the ARB, Summitt argued that it could postpone payments for an entire year until the employee's next anniversary date. *See* 5 A.R. 1819. Summitt presumably predicates this understanding on 1) the fact that the regulation "does not necessarily mean that the employee must be given the vacation or paid for it on the date on which it is vested"; and 2) that "the required vacation must be given or payment made in lieu thereof before the next anniversary date." By excising the remainder of the regulation and then fusing these bookend provisions together, Summitt concludes that it may freely delay employees' vested vacations for up to a year.

Of course, the fatal error in Summitt's argument is that it neglects to account for § 4.173(c)(2)'s important qualification: "The vacation *may* be scheduled according to a *reasonable plan mutually agreed to and communicated to the employees.*" *Id.* (emphasis added). The regulation surely liberates the contractor to delay vacation benefits, but to do so, it must draft, communicate to, and receive the assent of its employees to an actual plan that sets forth how and when vacation benefits may be used. When read in whole, § 4.173(c)(2) obviously forecloses Summitt's curious contention that it could unilaterally defer vacation benefits for a year.

This disposes of the argument that Summitt presented to the ARB. The Court, however, notes that Summitt has modified its argument slightly since it appeared before that body. Apparently abandoning its previous position that it could defer all vacation benefits for up to a year, Summitt now claims that it "should have been allowed to defer vacations and not pay the vacation benefit until the vacation actually was taken by a particular employee in accordance with a reasonable plan." Pls.' Mot. for Summ.J. at 24. Yet, as the ARB noted in rejecting Plaintiffs' motion for reconsideration, "there is no record evidence of a reasonable plan.... The only vacation 'plan' that can be gleaned from this record is that Summitt was either not going to pay employees at the time of their vacation, or was not going to allow any employee to take a vacation until the end of the year. Neither of these vacation 'plans' meet[s] the requirements of 29 C.F.R. § 4.173(c)(2)." 5 A.R.1911. The ARB's conclusion does not remotely reflect arbitrary and capricious decisionmaking.

### D. Conclusion on debarment

■ Having found that the ARB's rejection of the Plaintiffs' five alleged unusual circumstances was neither arbitrary nor capricious, little remains to be said. The ARB, relying on its own precedents, concluded that "the failure to pay employees because of 'financial problems resulting from poor business judgment' constitutes culpable neglect." 5 A.R. 1860 (quoting *Unified Servs., Inc.,* BSCA Case No. 92–36, Jan 28, 1994, at 8). This finding is supported by a preponderance of the evidence. Even the ALJ, who concluded that unusual circumstances were present, found that "Respondents' [Summitt, Wigfall, Holiday] inexperience, lack of knowledge and inadequate capital all played a role in the violations and the ultimate inability of Summitt to meet the payroll." 5 A.R. 1730. Notably, the ALJ only concluded that Summitt's actions were neither willful nor intentional; he made no finding as to whether the Plaintiffs acted with culpable neglect. While the ALJ was correct that the record does not support a finding of willful or intentional violations, the ARB's conclusion that Summitt's business miscalculations and poor

judgment constituted culpable neglect is not arbitrary or capricious. Because the regulations provide that unusual circumstances cannot exist where the contractor's conduct amounts to culpable neglect, *see* 29 C.F.R. § 4.188(b)(3)(i), the Court need go no further. Nonetheless, it bears mention that Summitt's vacation argument, *see supra* Subsection II.C.5, if not its overtime fringe-benefits argument, *see supra* Subsection II.C .3, hardly raises a "bona fide legal issue of doubtful certainty." 29 C.F.R. § 4.188(b)(3)(ii). Lastly, it cannot be doubted that "the impact of violations on unpaid employees," *id.,* was severe. Summitt's abject failure to meet its payroll during October and November impelled its own employees to walk off the job out of understandable frustration. The ARB's decision is affirmed.

### E. Count VII is not properly before this Court

Count VII of the Complaint alleges that the Department of Labor's efforts to debar the Plaintiffs violated the Fifth Amendment's Due Process Clause and equal protection component. Specifically, Plaintiffs first aver that the race of Summitt's owners and the company's status as a minority-owned business illegitimately animated the Department of Labor's decision to debar them. *See* Compl. ¶ 110. Second, they assert that the Department of Labor "has demonstrated a pattern of debarring small disadvantaged business for violations that are considerably less pervasive than violations committed by large businesses, such as 'Fortune 500' companies which are not recommended for debarment." *Id.* ¶ 111.

The administrative pedigree of Count VII's constitutional arguments is short and insubstantial. In their answers to the Administrator's original and amended administrative complaints, the Plaintiffs never raised a constitutional argument. At the hearing before the ALJ, the Plaintiffs offered no evidence to support their constitutional attack. On appeal before the ARB, the Plaintiffs never advanced an equal protection or due process challenge. Only in their motion for reconsideration to the ARB—after having retained new counsel—did the Plaintiffs articulate for

the first time an argument that touched upon the Constitution. Even this is charitable; for in their motion for reconsideration, the Plaintiffs never assailed the Department of Labor's actions as racially motivated—focusing instead only on the Department's alleged propensity to target small, non-"Fortune 500" businesses. *See* 5 A.R. 1889–90. The ARB quickly disposed of Summitt's untimely arguments first by noting that Summitt was raising its selective-enforcement claim "for the first time in its motion to reconsider," 5 A.R.1911, and then concluding in the next sentence that "[t]here is absolutely no support for this allegation in the record." 5 A.R.1912. This Court must now determine if Plaintiffs properly exhausted their administrative remedies, and if not, whether a recognized exception to the exhaustion doctrine nonetheless permits them to prosecute Count VII.

### 1. *Plaintiffs did not exhaust their administrative remedies*

■ Plaintiffs only faintly suggest that they properly presented their constitutional arguments to the agency by raising them for the first time in a motion for reconsideration before the ARB. *See* Pls.' Opp'n to Defs.' Mot. Regarding Count VII of the Compl. at 7–8. Both case law and the mechanics of regulatory adjudication under the SCA demonstrate that Plaintiffs' eleventh-hour bid to have the ARB rule on issues never before raised fails to exhaust administrative remedies. First, unlike some statutes that require as a condition precedent to seeking judicial review that a party petition for reconsideration before an agency board, *see, e.g.,* 47 U.S.C. § 405(a), the SCA imposes no such obligation. Thus, once the ARB issues its final decision reviewing the ALJ, the agency process is complete and there exists a final agency action from which a party may seek judicial review.

Moreover, the SCA's implementing regulations dramatize the impropriety of raising newly minted issues before the ARB that were not presented to the ALJ during the fact-finding process. Section 8.1(d) of the Code of Federal Regulations provides: "The Board is an appellate body and shall decides

cases properly brought before it on the basis of all relevant matter contained in the entire record before it. Decisions by the Board shall be based upon a preponderance of the evidence before it." 29 C.F.R. § 8.1(d). As an "appellate body" charged with deciding cases based on the "record before it," the ARB is hardly the forum for raising novel legal theories that depend upon facts never developed in the "record before it." Lest there be any doubt, section 7.1(e) makes explicit what is implicit in section 8.1(d). That provision states: "The Board is essentially an appellate agency. It will not hear matters de novo except upon a showing of extraordinary circumstances." 29 C.F.R. § 7.1(e). There appears to be no "extraordinary circumstance" that justifies Summitt's attempt to present its arguments de novo to the ARB through a motion for reconsideration. Although the regulations authorize the Board to remand a matter to the ALJ "for the taking of additional evidence and the making of new or modified findings by reason of the additional evidence," *id.,* Plaintiffs did not petition the ARB to remand the matter to the ALJ for further fact-finding; they simply asked the Board "to reconsider the debarment in light of" their never-before-pled claims. Given the narrow appellate role that the regulations assign to the ARB, Plaintiffs' attempt to raise new issues in its motion for reconsideration was improper.

■ Furthermore, it is a cardinal tenet of federal-civil practice that a court—trial or appellate—will not consider matters raised for the first time in a motion for reconsideration. *See, e.g., CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1526 (1st Cir.1996) ("We have little trouble, however, in concluding that there is absolutely no merit [to the proposition] that we should find [a party's] arguments preserved because they were advanced in its motion for reconsideration."); *Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir.1995) ("It is not the purpose of allowing motions for reconsideration to enable a party to complete presenting his case after the court has ruled against him."); *American Meat Inst. v. Pridgeon,* 724 F.2d 45, 47 (6th Cir.1984) ("Defendants raised their issue regarding severability for the first time in their motion for reconsidera-

tion.... By bringing this issue before the District Court in such an untimely fashion, defendants effectively waived their argument on severability and have no basis to assign failure to sever as an error on this appeal."). To be sure, none of these cases addresses the effect of raising new arguments during an administrative motion for reconsideration. At least under the SCA, however, this seems to be a distinction without a difference. The Court can divine no reasonable basis for concluding that, although a federal appellate court will refuse to review matters raised for the first time in a motion to reconsider, an agency's appellate board must nonetheless "enable a party to complete presenting his case after the court has ruled against him." *Frietsch*, 56 F.3d at 828. Accordingly, the Court concludes that Plaintiffs failed to exhaust their administrative remedies on Count VII of the Complaint.

### 2. *No exception to the exhaustion doctrine preserves Count VII*

The general rule in administrative adjudication posits that a party must exhaust administrative remedies before seeking judicial review. *See McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Marine Mammal Conservancy v. Department of Agric.*, 134 F.3d 409, 411 (D.C.Cir.1998). The exhaustion doctrine exists to promote such salutary ends as: 1) assuring that parties respect the administrative process and refrain from flouting or ignoring its procedures; 2) protecting administrative autonomy by permitting the agency to employ its expertise, exercise its discretion, and correct its own errors; 3) developing a factual record that the court can consult when conducting its review; and 4) fostering judicial economy by avoiding duplicative fact-finding by the agencies and the courts while potentially resolving claims without judicial intervention. *See McKart*, 395 U.S. at 193, 89 S.Ct. 1657; *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1984); *Washington Legal Found. v. Kessler*, 880 F.Supp. 26, 33 (D.D.C.1995). Where exhaustion will not advance these goals, however, courts have crafted narrow exceptions that permit parties to bypass the administrative process.

Plaintiffs argue that failure to exhaust administrative remedies can never foreclose a party from asserting a claim of constitutional right in federal court. So unqualified is this exception, as the Plaintiffs conceive it, that "any person whose constitutional rights are aggrieved may go directly to federal court—whether or not there may exist an administrative remedy." Pls.' Opp'n to Defs.' Mot. Regarding Count VII of the Compl. at 2. Therefore, by Summitt's view, the constitutional dimensions of Count VII pardon the Plaintiffs from presenting their allegations during the administrative process.

Just this year, the Court of Appeals for the District of Columbia Circuit explicitly rejected the same argument that Summitt offers here. The unanimous panel held that "Marine Mammal is very much mistaken in believing that there is some bright-line rule allowing litigants to bypass administrative appeals simply because one or all of their claims are constitutional in nature." *Marine Mammal*, 134 F.3d at 413 (citing *Thetford Properties v. United States Dep't of Hous. & Urban Dev.*, 907 F.2d 445, 448 (4th Cir. 1990)). There is nothing talismanic about a claim denominated as "constitutional" because "[e]xhaustion even of constitutional claims may promote many of the policies underlying the exhaustion doctrine." *Id.* at 413–14 (citing *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Rafeedie v. INS*, 880 F.2d 506, 513–17 (D.C.Cir.1989); *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 733–40 (D.C.Cir.1987) (Edwards, J., separate opinion); 2 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 15.5 (3d ed.1994)). Here, as in *Marine Mammal*, "those policies—giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, compiling a record adequate for judicial review, promoting judicial efficiency—weigh decidedly against [Summitt's] position." *Id.* at 414 (citations omitted).

Summitt asks this Court to find that the Department of Labor has violated the Fifth Amendment's due process and equal protection components by selectively enforcing the

debarment provision of the SCA against minority-owned and disadvantaged small businesses. *See* Compl. ¶¶ 111–12. This is not simply a facial challenge to the constitutionality of the SCA. To the contrary, it questions the legitimacy of the Department of Labor's practices and informal rules. By its nature, the claim is heavily fact-driven and demands a well-developed record to permit a reviewing court to determine intelligently whether the claim has merit. By failing to present its constitutional argument at the administrative level, the Plaintiffs sapped this Court of any meaningful record. More importantly, had the Plaintiffs timely raised their arguments, the ARB "might well have decided the case differently, eliminating entirely the need for us to rule on the constitutional questions." *Marine Mammal,* 134 F.3d at 414. Such a result would also advance the Department of Labor's interest in having an opportunity to correct its own errors. *See McCarthy v. Madigan,* 503 U.S. 140, 145–46, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Marine Mammal,* 134 F.3d at 414. Count VII, therefore, is dismissed based on the Plaintiffs' failure to raise the claims during the administrative process.

### III. CONCLUSION

For the foregoing reasons, the Court grants the Defendant's Motion for Summary Judgment and denies the Plaintiffs' cross-motion for summary judgment. Furthermore, the Court dismisses Count VII for failing to present those claims at the administrative level.

An Order accompanies this Memorandum Opinion.

### ORDER

For the reasons expressed in the Court's accompanying Memorandum Opinion, it is, this 30 day of September 1998, hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment [# 18] shall be, and hereby is, **DENIED;** and it is

**FURTHER ORDERED** that Defendant's Motion for Summary Judgment [# 17] shall be, and hereby is, **GRANTED;** and it is

**FURTHER ORDERED** that Defendant's Motion Regarding Count VII of the Complaint [# 13] shall be, and hereby is, **GRANTED;** and it is

**FURTHER ORDERED** that **JUDGMENT** shall be, and hereby is, entered in favor of Defendant in the above-captioned case; and it is

**FURTHER ORDERED** that the above-captioned case shall be, and hereby is,

**DISMISSED** from the dockets of this court.

**SO ORDERED.**