USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1830

 DANTRAN, INC., ET AL.,

 Plaintiffs, Appellants,

 v.

 U. S. DEPARTMENT OF LABOR,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Gene Carter, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Cudahy,* Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 

 Richard P. Romeo, with whom Seth D. Harrow and Smith, Elliott,
Smith & Garmey, P.A. were on brief, for appellants.
 Mary J. Rieser, Attorney, United States Department of Labor,
with whom Judith E. Kramer, Deputy Solicitor, Steven J. Mandel,
Associate Solicitor, and Paul L. Frieden, Counsel for Appellate
Litigation, were on brief, for appellee.

March 29, 1999

 
_______________
*Of the Seventh Circuit, sitting by designation. SELYA, Circuit Judge. The Secretary of Labor (the
Secretary) accused Dantran, Inc., and its principal, Robert C.
Holmes (collectively, the plaintiffs), of having violated certain
provisions of the McNamara-O'Hara Service Contract Act of 1965, 41
U.S.C. 351-358 (the Act), and the regulations thereunder. She
wished to debar the plaintiffs, that is, to place them on a list of
contractors with whom no government entity may transact business,
for a period of three years. The district court, echoing a
determination of the Labor Department's Administrative Review Board
(the ARB), authorized debarment. We reverse.
I. BACKGROUND
 For over a decade, the United States Postal Service
routinely awarded contracts to Dantran for hauling mail between
various sites in Maine, Vermont, New Hampshire, and Massachusetts. 
During this period, Dantran operated profitably; in its heyday, the
company employed approximately 40 persons and generated annual
revenues in the $2,000,000 range. The tectonic plates shifted in
mid-1991, when the Secretary, acting on a compliance officer's
conclusion that the company's practices violated certain
regulations dealing with, among other things, employee fringe
benefit payments, "froze" funds owed to Dantran by the Postal
Service.
 If the Secretary's earlier investigation of Dantran
provided any baseline for comparison, the results of the 1991 probe
must have come as something of a shock. In 1989, the Secretary had
sent a compliance officer to inquire into Dantran's payroll
practices. On that occasion, the investigator, George Rioux,
uncovered no irregularities. Rioux's final report specifically
noted that there were no problems with Dantran's fringe benefit
payment practices.
 When the Wage and Hour Division returned in 1991,
Dantran's practices had not changed at all from 1989. The
Secretary's outlook apparently had: shortly after the new
compliance officer, Scott Wilkinson, began his review, he informed
the plaintiffs that two of Dantran's routine practices paying
employees on a monthly basis and capping fringe benefits at 40
hours per week regardless of the number of contracts, or hours per
contract, an employee actually worked violated the Act.
 In response to Wilkinson's admonitions, the plaintiffs
promptly devised a plan to inaugurate semi-monthly wage payments
and commenced negotiations to identify the amounts due in respect
to the cross-crediting of fringe benefits. Wilkinson nonetheless
recommended that the Secretary freeze some $20,000 owed to Dantran
by the Postal Service to satisfy his estimate of what Dantran owed
its employees by virtue of cross-crediting. The Secretary obliged. 
The timing could not have been worse. Cf. Benjamin Franklin, Poor
Richard's Almanac (1758) (explaining how for want of a nail, the
kingdom was lost). Without the withheld funds, Dantran could not
cover insurance premiums on its fleet of trucks and, unable to keep
the uninsured trucks in service, suspended operations. This, in
turn precipitated a further withholding of funds, to the tune of
some $60,000, without which Dantran could not meet its July 1991
payroll.
 Dantran and the Secretary eventually settled all wage-
related matters. The settlement totaled roughly $67,000, ($40,000
of which consisted of the wages Dantran had been unable to pay in
July 1991). Despite the fact that the settlement made Dantran's
work force whole, Wilkinson's final report pressed for debarment
"because of the size of the violations and the fact that the firm
was investigated once before." The Secretary acquiesced and, in
her complaint, attempted to justify so extreme a sanction on the
basis of cross-crediting and an alleged failure adequately to
maintain records. The case was tried before an Administrative Law
Judge (ALJ). During the hearing, the Secretary raised two new
issues: the frequency of payment of wages and Dantran's failure to
pay its employees in July 1991 (when the Secretary froze its
revenue stream).
 In the end, the ALJ concluded that Holmes's testimony was
credible and that neither he nor Dantran should be debarred. In
his view, the case boiled down to cross-crediting and frequency of
wage payments. He determined that Dantran's practices in these
respects did not transgress the regulations. As an alternative
holding, the ALJ further concluded that Dantran had continued the
challenged practices in reasonable reliance on the results of the
Secretary's earlier investigation and that the case therefore
displayed unusual circumstances sufficient to warrant relief from
debarment. See 41 U.S.C. 354(a). These circumstances included,
in addition to the fact that the plaintiffs had been misled by the
Secretary's earlier investigation and by statements of various
Postal Service employees, three additional facts: (1) Dantran had
not acted culpably, willfully, or deliberately to violate the law;
(2) it had an excellent history of compliance with the wage and
hour laws; and (3) the plaintiffs had fully cooperated with the
Secretary's inquiry.
 The Secretary appealed the ALJ's ruling to the ARB, which
reversed. It found that the cross-crediting and frequency of
payment practices violated the regulations and that Dantran had
been culpable in disregarding the law because, during the 1989
indagation, Rioux had given Holmes a copy of the regulations (which
should have alerted Dantran to the illegality of its actions). The
ARB deemed this finding of culpable disregard dispositive on the
question of debarment.
 The plaintiffs sought judicial review of the ensuing
debarment order. In a brief, unpublished memorandum, the district
court rejected their plea. This appeal followed. Because the ARB
predicated its debarment order on two of Dantran's practices 
cross-crediting and making monthly wage payments we discuss each
practice.
II. CROSS-CREDITING
 With certain exceptions not relevant here, the Act
provides that every service contract entered into by the United
States "shall contain" provisions specifying the fringe benefits
which those employees of the contractor who perform the work will
receive. See 41 U.S.C. 351(a)(2). The Act lists the types of
fringe benefits that must be included in such a package, including
items such as health insurance, life insurance, and retirement
benefits. See id. Instead of prescribing a single method for the
delivery of these benefits, the Act permits employers to choose the
manner in which they wish to satisfy their statutory obligation. 
Exercising this latitude, many employers opt to discharge parts of
it by making payments in cash to the affected employee (or to a
union trust fund on his behalf) in a sum equivalent to the value of
certain benefits owed.
 The Act leaves room for the operation of the collective
bargaining process in valuing fringe benefits. See id. Often,
however, service contractors abide by general per-hour valuations
determined by the Secretary, based on the Secretary's assessment of
prevailing fringe benefit arrangements applicable to similarly
situated employees in a particular locality. See id.; see also 29
C.F.R. 4.51. Thus, for example, if truck drivers in rural
Vermont typically earn fringe benefits worth $2.80 per hour, the
Secretary might well ask a service contractor to pay that amount to
its truck drivers who operate principally in rural Vermont. The
particular wage/benefit terms applicable to a specific service
contract between an employer and a government agency typically are
written into that contract, and so it was with the contracts
entered into between Dantran and the Postal Service.
 The dispute in this case concerns not the values assigned
to fringe benefit payments (i.e., the per-hour rates), but the
total number of hours per week for which a service contractor must
make payments to its employees. Relying on the regulations the
statute is silent on the matter the Secretary argues, and the ARB
agreed, that when employees work on multiple contracts for a single
employer, they are entitled to fringe benefits corresponding to
every hour they work on each particular contract in a given week,
up to a maximum of 40 hours worth of fringe benefits per contract. 
In other words, under the Secretary's reading of the regulations,
fringe benefit determinations turn not on the total number of hours
worked per week, but on the number of different contracts to which
an employee is assigned.
 To illustrate, assume that a service contractor has three
separate mail-hauling contracts with the Postal Service, and that
in a given week worker A spends 25 hours on contract X, 20 hours on
contract Y, and 10 hours on contract Z. According to the
Secretary, worker A must receive an incremental payment equal to 55
hours worth of fringe benefits, notwithstanding that worker B, who
likewise toiled for 55 hours that week but spent it all in carrying
out contract X, will only receive a payment equal to 40 hours worth
of fringe benefits. In contrast, Dantran's interpretation is not
contract-specific. On its understanding, both A and B would
receive incremental payments in lieu of fringe benefits equal to
the rate times 40 hours. It follows, then, that if the Secretary's
reading of the regulation is correct, Dantran's use of cross-
crediting constituted a violation. Giving due weight to the
language and structure of the regulations, we find the Secretary's
gloss insupportable.
 The regulations' general provision on fringe benefits
states, in pertinent part, that "every employee performing on a
covered contract must be furnished the fringe benefits required" by
the particular contract "for all hours spent working on that
contract up to a maximum of 40 hours per week and 2,080 (i.e., 52
weeks of 40 hours each) per year, as these are the typical number
of nonovertime hours of work in a week, and in a year,
respectively." 29 C.F.R. 4.172. Although at first glance one
might read the 40-hour cap on benefits to refer to "that contract,"
which would imply that the 40-hour maximum applies independently to
each contract on which an employee toils, the whole of the proviso
belies this reading. The sentence we have quoted explains that the
reason why the regulations have capped fringe benefits at "a
maximum of 40 hours per week" is that this figure represents "the
typical number of nonovertime hours of work in a week." This is a
clear indication that the Secretary intended to make the number of
nonovertime hours worked in a week her criterion for determining
the amount of fringe benefit payments due. Because the Secretary's
reading of this provision mandates fringe benefit payments for
overtime hours in addition to nonovertime hours, it contravenes the
explicit text of her own regulation and is therefore untenable. 
See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)
(noting that an agency's interpretation of a regulation is not
given controlling weight when it is inconsistent with, or
contradicts, the plain language of the regulation).
 The Secretary attempts to parry this thrust by citing the
next sentence in section 4.172, which reads: "Since the Act's
fringe benefit requirements are applicable on a contract-by-
contract basis, employees performing on more than one contract
subject to the Act must be furnished the full amount of fringe
benefits to which they are entitled under each contract and
applicable wage determination." The Secretary's position involves
some circularity: she strives to export the "contract-by-contract
basis" language from the later sentence into the earlier in order
to establish that the 40-hour maximum refers to each and every
contract, and then attempts to import that understanding back into
the later sentence to argue that the phrase "to which they are
entitled" must refer to 40 hours per week per contract.
 We decline this invitation to distort the plain meaning
of the earlier sentence by linguistic legerdemain. To adopt the
Secretary's construction would eviscerate the regulation's
expression of its rationale for establishing a 40-hour maximum,
namely, that such a figure represents the typical nonovertime work
week. Moreover, such a course also would entail abandonment of the
accepted rule that all words and phrases in a statute or regulation
should be given effect. See Walters v. Metropolitan Educ.
Enterps., Inc., 117 S. Ct. 660, 664 (1997); McIntosh v. Antonino,
71 F.3d 29, 35 (1st Cir. 1995); United States v. Ven-Fuel, Inc.,
758 F.2d 741, 751-52 (1st Cir. 1985).
 We hasten to add that recognizing an absolute 40-hour
weekly maximum is perfectly consistent with the language of the
second sentence. The "contract-by-contract" language in that
sentence most probably is meant to clarify that employers must give
credit to employees for work done on each contract, perhaps to
avoid situations in which an employer might seek to shortchange
employees by assigning them to work less than 40 hours on each of
several contracts, and then limiting the corresponding fringe
benefit payment to work done on a single contract. On this
reading, the next passage (mentioning the "full amount of fringe
benefits to which [employees] are entitled under each contract")
simply refers to a number less than or equal to the 40-hour
maximum.
 Other, related sections of the regulations also call the
Secretary's proposed interpretation of section 4.172 into question. 
Consider the regulation that addresses vacation pay. This section
purports to synthesize the intent of section 4.172. It states: 
"As set forth in 4.172, unless specified otherwise in an
applicable fringe benefit determination, service employees must be
furnished the required amount of fringe benefits for all hours paid
for up to a maximum of 40 hours per week and 2,080 hours per year." 
29 C.F.R. 4.173(e)(2) (emphasis supplied). In our estimation,
this language confirms that 40 hours per week operates as an
aggregate cap on an employee's entitlement to fringe benefit
payments, regardless of the number of contracts involved.
 Perhaps the most telling sign of the agency's intent
appears in an example that the regulations supply to illuminate
their effect. The example follows almost immediately after section
4.175(a)(1), see supra note 2, and states that if an employee works
32 hours in one week and receives 8 hours of holiday pay, then he
is "entitled to the maximum of 40 hours of health and welfare
and/or pension payments in that workweek." 29 C.F.R. 
4.175(a)(1)(ii). The insertion of the definite article ("the")
preceding the phrase "maximum of 40 hours" itself strongly suggests
that the regulations intend to set an overall ceiling of 40 hours
per week on fringe benefit payments. Even more telling is the
example's next sentence, which explains: "If the employee works
more than 32 hours and also received 8 hours of holiday pay, the
employee is still only entitled to the maximum of 40 hours of
health and welfare and/or pension payments." Id. This statement
is completely at odds with the Secretary's rendition of the
regulations. If fringe benefit payments are only subject to per-
contract ceilings, as the Secretary insists, then the hypothetical
worker described in the example would be entitled not only to 8
hours worth of benefits attributable to his holiday pay, but also
to at least 40 hours of benefits for his work and more if he
labored on multiple contracts.
 We are not unmindful of our wonted obligation to defer
to the Secretary's construction of her legislative rules. SeeMartin v. OSHRC, 499 U.S. 144, 150-51 (1991); P. Gioioso & Sons v.
OSHRC, 115 F.3d 100, 107 (1st Cir. 1997). Here, however, when the
regulations are read as a whole, the conclusion, already dictated
by plain language, becomes inexorable: employees who work for a
single service contractor are only entitled to fringe benefit
payments up to a maximum of 40 hours per week, regardless of the
number of contracts on which they labor. This obvious
inconsistency between what the regulations say and what the
Secretary says they say eliminates any need for judicial deference. 
See, e.g., Thomas Jefferson Univ., 512 U.S. at 512.
 In all events, courts should be reluctant to rubber-stamp
an agency's interpretation of its regulations when that
interpretation has no plausible link to the goals of the regulatory
scheme and would lead to absurd results. See P. Gioioso & Sons,
115 F.3d at 107. In this instance, the Secretary's interpretation
creates anomalous situations in which employees doing the same kind
of work for the same hours will receive different levels of fringe
benefit payments merely because the employer happens to assign them
to work within the parameters of one, two, or more different
contracts. At oral argument, we asked the Secretary's counsel
directly if the Secretary could provide us with any policy
rationale that would justify so quixotic an outcome. Counsel was
unable to identify any way in which the Secretary's position
plausibly advances (or even jibes with) the purposes of the wage
and hour regulations.
 Federal courts long have recognized that this statutory
and regulatory scheme comprises "remedial labor legislation." 
Midwest Maint. & Constr. Co. v. Vela, 621 F.2d 1046, 1050 (10th
Cir. 1980). If labor concerns are the focal point of this scheme
 and we firmly believe that they are we can perceive no direct
relation, at any level of generality, between the Secretary's
interpretation of the rules and the purposes that Congress intended
to serve. If anything, the Secretary's proffered construction runs
at cross-purposes with the Act, for it creates disparities in the
treatment of employees who do the same work for the same employer
for the same amounts of time. See supra note 3. Consequently, we
are unable to sustain the Secretary's position.
III. MONTHLY WAGE PAYMENTS
 We detect no flaw in the Secretary's construction of the
frequency of payment requirement. Although the Act itself does not
prescribe the length of requisite pay periods, the debarment
sanction is not limited to statutory violations simpliciter. The
Act is written in general terms, and Congress has conferred upon
the Secretary broad power to implement its provisions by, among
other things, fashioning legislative rules. See 41 U.S.C. 
353(a). Once duly promulgated, such rules become part of the warp
and woof of the Act's enforcement scheme, see id., and, if
reasonably faithful to the statutory language and intent,
constitute binding law.
 So it is here: the Secretary promulgated a regulation,
29 C.F.R. 4.165(b), which states bluntly that "[a] pay period
longer than semimonthly is not recognized as appropriate for
service employees and wage payments at greater intervals will not
be considered as constituting proper payments in compliance with
the Act." In wording the regulation, the Secretary made it crystal
clear that monthly pay periods will not do. The regulation is
valid and the plaintiffs are bound by its terms.
 The plaintiffs have a fallback position. Brandishing the
clean bill of health that they received in the report of the 1989
wage-and-hour investigation, they contend that they reasonably
relied on that report's conclusions, and, therefore, that the
government should be estopped from pursing an action based on
practices (like the monthly payment of wages) that drew no
criticism at that time. They stress that Rioux (the first
compliance officer) knew of their monthly payment ritual and argue
that his silence on the matter suggested to them that they were in
compliance. Had he questioned the practice then, they quickly
would have taken corrective action (as they did when the second
compliance officer, Wilkinson, raised the issue in 1991). To
reinforce this point, the plaintiffs also note that the Postal
Service paid them on a monthly basis, was on notice that Dantran
paid its employees on the same schedule (indeed, Dantran regularly
submitted copies of its payroll records to the Postal Service), and
tacitly approved the regime.
 Estoppel against the government is a concept more
frequently discussed than applied. While the Supreme Court has
never definitively ruled out the possibility of an estoppel against
the government, it consistently has emphasized the difficulties
that such a concept entails. See, e.g., OPM v. Richmond, 496 U.S.
414, 419-20, 423 (1990) (plurality op.); Heckler v. Community
Health Servs., 467 U.S. 51, 60-61 (1984). If estoppel against the
government possesses any viability (a matter on which we take no
view), the phenomenon occurs only in the most extreme
circumstances. This case does not qualify.
 The plaintiffs argue that estoppel is available here
because they invoke it as a shield rather than a sword. This
distinction apparently has its roots in OPM, wherein the Court
restricted its holding to cases involving demands made upon the
public fisc. 496 U.S. at 426-28. But such commendable chariness
does not signify that the Court has ever approved or hinted at
approving a sword/shield distinction. Because blanket adherence
to the distinction would conflict with fundamental tenets that
underlie estoppel jurisprudence, we reject it.
 Using estoppel as a shield implies nothing less than
frustrating the government's authority to enforce valid laws. We
cannot in good conscience accept a broad rule that prevents the
sovereign from enforcing valid laws for no better reason than that
a government official has performed his enforcement duties
negligently. It does not overstate the case to say that such a
rule would risk embroiling the judiciary in the Executive Branch's
duty faithfully to execute the law and thereby would raise
separation of powers concerns. See United States v. Marine Shale
Processors, 81 F.3d 1329, 1348 (5th Cir. 1996).
 The most obvious manner in which a sword/shield dichotomy
would raise separation of powers concerns is by placing the
sovereign in a position where, in order to recognize estoppel
relief, it would itself have to violate the law. Such a result is
untenable and, not surprisingly, numerous cases have held that
estoppel must fail under such circumstances. See OPM, 496 U.S. at
430; Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385-86
(1947); Utah Power & Light Co. v. United States, 243 U.S. 389, 408-
09 (1917); see also FDIC v. Hulsey, 22 F.3d 1472, 1489 (10th Cir.
1994) (positing that estoppel, if available at all, would only
succeed if it would "not frustrate the purpose of the statutes
expressing the will of Congress"). This type of holding extends to
legal requirements fixed by duly promulgated regulations. SeeSchweiker v. Hansen, 450 U.S. 785, 790 (1981) (per curiam); Federal
Crop Ins., 332 U.S. at 384-85.
 In the instant case, the Act's enforcement scheme
requires the Secretary to initiate debarment proceedings when she
determines that a government contractor has violated the Act or the
regulations. Were we to adopt the plaintiffs' suggested
sword/shield distinction, we would frustrate the operation of this
enforcement mechanism without so much as even inquiring into the
equities of the particular case. We are not prepared to embark on
so poorly conceived an itinerary.
 Our concerns would be no different if the Act's
enforcement scheme lay entirely within the Secretary's discretion. 
There, too, estoppel even "shield-type" estoppel would
insinuate the Judicial Branch into the Executive Branch's exclusive
preserve and would carry a serious potential of undermining the
Executive Branch's policies and priority setting in enforcing the
laws a result that is no more palatable than frustrating the
congressional will. See Marine Shale Processors, 81 F.3d at 1348-
49; Hulsey, 22 F.3d at 1489.
 Beyond the attempted sword/shield distinction, the
plaintiffs' estoppel claim is insubstantial. It is firmly settled
that a party seeking to raise estoppel against the sovereign must,
at the very least, demonstrate that government agents have been
guilty of affirmative misconduct. See Drozd v. INS, 155 F.3d 81,
90 (2d Cir. 1998); Linkous v. United States, 142 F.3d 271, 277-78
(5th Cir. 1998); Frillz, Inc. v. Lader, 104 F.3d 515, 518 (1st
Cir.), cert. denied, 118 S. Ct. 59 (1997); see also OPM, 496 U.S.
at 421-22; see generally Kenneth Culp Davis & Richard J. Pierce,
Jr., 2 Administrative Law Treatise 13.1, at 232 (3d ed. 1994). 
In this case, no estoppel lies because the record reflects no
affirmative governmental misconduct.
 It is common ground that affirmative misconduct requires
something more than simple negligence, see United States v. Hemmen,
51 F.3d 883, 892 (9th Cir. 1995); Kennedy v. United States, 965
F.2d 413, 421 (7th Cir. 1992); Azizi v. Thornburgh, 908 F.2d 1130,
1136 (2d Cir. 1990), and the plaintiffs' proof does not cross that
threshold. The plaintiffs base their estoppel initiative on
Rioux's conduct and, to a lesser extent, that of various Postal
Service plenipotentiaries. But, though Rioux's final report
disclaims any violations of the Act, no one argues that he made
that statement with an intent to mislead the plaintiffs about their
responsibilities. So, too, the comments attributed to various
officials of the Postal Service. In a nutshell, there is not the
slightest whiff of affirmative misconduct.
 In a related vein, if a statute or regulation clearly
limns a party's legal obligations, the party cannot justifiably
rely for estoppel purposes on a government agent's representation
that the law provides to the contrary. See Federal Crop Ins., 332
U.S. at 383-84; Marine Shale Processors, 81 F.3d at 1349-50
(collecting cases). This is so because the government speaks most
authoritatively through its official policymaking machinery, not
through individuals, even if the individuals occupy responsible
agency positions. See Federal Crop Ins., 332 U.S. at 384; Irvingv. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc). 
Here, even if the plaintiffs relied on Rioux's report and/or the
statements of postal officials to conclude that their regimen did
not violate the Secretary's frequency of payment requirement, the
clear language of the applicable regulation would render such
reliance unreasonable.
IV. RELIEF FROM DEBARMENT
 We grapple next with an issue of some complexity. Both
the statute and the regulations provide that the existence of
"unusual circumstances" may forestall the imposition of a debarment
sanction. See 41 U.S.C. 354(a); 29 C.F.R. 4.188(a). Although
the Act does not elaborate, the Secretary has established that the
existence of "unusual circumstances" in a given case depends on the
absence of aggravating factors and the presence of mitigating
factors. See 29 C.F.R. 4.188(b)(3)(i)-(ii). The plaintiffs
assert that their case fits within these confines.
 A first, potentially conclusive, step in the pavane
involves aggravation. Under the regulations, if aggravating
factors inhere, a government contractor cannot be saved from
debarment. See id. 4.188(b)(3)(ii). The regulations describe in
some detail what constitutes aggravation. They speak in terms of
"deliberate" or "willful" conduct, "culpable neglect," and
"culpable disregard," id. 4.188(b)(3)(i), and thus evince a
design to ensure blacklisting of those who have defied the law with
a degree of impunity or premeditation. What the regulations mean
by the term "culpable" is not spelled out, except to stipulate that
"falsification of records" (an evil not present in this case)
qualifies as "culpable failure to comply with recordkeeping
requirements." Id. If this latter example is intended to serve as
a guide, culpability must require more than simple negligence or a
mere failure to ascertain whether one's practices coincide with the
law's demands.
 The ARB concluded that the plaintiffs' conduct satisfied
the standard of culpability. This conclusion relied, in part, on
the plaintiffs' practice of cross-crediting fringe benefits and, in
part, on the plaintiffs' violation of the frequency of payment
regulation. The first ground does not hold water given our
determination that the Act allows cross-crediting. See supra Part
II. Thus, the ARB's finding of aggravation must stand or fall on
the second ground.
 The ARB found the violation relating to monthly wage
payments culpable due to the clarity of the prohibitory regulation. 
But this assumes that the enforcement scheme mandates debarment
whenever an employer violates an unambiguous regulation. This
assumption is unfounded.
 The regulations speak of "culpable neglect to ascertain"
or "culpable disregard" of whether one is in violation of the Act
as being criteria for finding factors in aggravation. To hold that
this language renders culpable every violation of an unambiguous
regulation would, for all practical purposes, turn the debarment
provision into a strict liability regime. The very invocation of
a culpability standard, however, is a sure sign that strict
liability is not what the Secretary intended. This view is
explicitly confirmed by the Secretary's incorporation into the
regulations of a portion of the Act's legislative history which
states that "[t]he authority [to relieve from blacklisting] was
intended to be used in situations where the violation was a minor
one, or an inadvertent one, or one in which disbarment . . . would
have been wholly disproportionate to the offense." 29 C.F.R. 
4.188(b)(2) (alterations in the original). The ARB's strict
liability regime drains section 4.188(b)(2) of meaning: after all,
a violation of an unambiguous regulation can be minor, inadvertent,
wholly disproportionate to a proposed debarment, or all of the
above. Thus, simply stating that an employer violated an
unambiguous regulation, without more, cannot justify debarment.
 The ARB's reliance on a different portion of the same
regulation does not affect our conclusion. Section 4.188(b)(1)
states, in pertinent part, that unusual circumstances do not
include instances "such as negligent or willful disregard of the
contract requirements and of the Act and regulations, including a
contractor's plea of ignorance of the Act's requirements where the
obligation to comply with the Act is plain from the contract." 
Drawing on this language and on the fact that the plaintiffs were
in possession of a copy of the regulations, the ARB reasoned that
debarment was warranted. We are not convinced.
 Fairly read, this language contemplates an automatic
finding of culpability only when the law's requirements are obvious
on the face of the contract. Under such circumstances, a
contractor's disregard of legal requirements legitimately can be
considered willful or grossly negligent, and thus manifest the
species of culpability delineated by the regulations. Here,
however, none of Dantran's contracts with the Postal Service
provided notice of the Secretary's interpretation of her frequency
of payment rule. The reverse is closer to the truth, for the
contracts themselves provided for monthly payments to Dantran and
thus appeared to confirm Dantran's historic payroll practices. In
this case, then, it is not enough to point to possession of the
regulations, and rest. There must be affirmative evidence of
culpable conduct.
 This brings us to the second reason upon which the ARB
premised its determination that Dantran's monthly payment protocol
warranted debarment. In the last analysis, this is less a reason
than a self-fulfilling prophecy. The ARB describes this reason as
"ample evidence" of culpable conduct, and cites two purported facts
to prove ampleness: first, the plaintiffs' longstanding practice
of monthly wage payments; and second, their attitude toward the
first compliance officer when he allegedly raised questions anent
this practice. These two "facts" telescope into one, for the
significance of the first "fact" depends entirely on the validity
of the assumption that underlies the second. If no questions were
raised about monthly payments during the first investigation, then
the plaintiffs scarcely can be criticized for continuing the
established praxis.
 The assumption underlying the second "fact" rests solely
upon the following testimony from Rioux's direct examination:
 Q. . . . What about the payments on
 a monthly basis? How were they
 paying people? If you know.

 A. I think they were paying on a
 monthly basis back then. And I
 think we discussed that. I'm
 not sure exactly when, but . . .

 Q. Okay, but you did discuss it
 with him. what were the nature
 what did you tell him
 regarding the payment on a
 monthly basis?

 A. Then this is going by memory,
 but it's a final conference,
 initial conference, in between. 
 We did talk about it. I said
 the regulations call for payment
 on a semi-monthly, bi-weekly
 basis. And he said, "the post
 office pays me on a monthly
 basis When they pay me on a bi-
 weekly basis, I'll pay them on a
 bi-weekly basis."

According to the ARB, this exchange demonstrates that Dantran's
subsequent monthly payment of employees knowingly violated the law. 
We conclude that the ARB, in superimposing its interpretation of
this testimony upon the decisional calculus, failed to accord due
deference to the ALJ's findings of fact.
 An odd standard of review obtains here. In cases arising
under the Act, courts do not employ the "substantial evidence" test
that most frequently accompanies judicial review of final
administrative orders. See, e.g., 7 U.S.C. 706(2)(E)
(Administrative Procedure Act); see also Universal Camera Corp. v.
NLRB, 340 U.S. 474, 490-91 (1951). Instead, the Service Contract
Act, 41 U.S.C. 353(a), incorporates the hearing provisions of the
Walsh-Healey Act, 41 U.S.C. 38-39, and thereby adopts a standard
of review under which findings of fact made by the Secretary's
authorized representative upon notice and hearing are conclusive if
supported by a preponderance of the evidence. See Vigilantes, Inc.v. Administrator of Wage & Hour Div., 968 F.2d 1412, 1418 (1st Cir.
1992) (explicating standard of judicial review for cases under the
Act).
 This standard presents certain interpretive difficulties. 
Asking an appellate tribunal to review a factfinder's conclusions
for a "preponderance of the evidence" gives a familiar phrase a new
twist. In its normal iteration, the preponderance of the evidence
standard, like "clear and convincing" and "beyond a reasonable
doubt," establishes a quantum of proof to be measured by the
factfinder, not a standard for error-detection. When used to
describe appellate review, however, the phrase is at best an
awkward locution, for it connotes nothing about the degree of
probability of error required before a reviewing court may set
aside a factual determination. If an appellate tribunal were to
apply the preponderance of the evidence standard literally, it
would mire itself in a factfinding exercise inconsistent with the
accepted appellate role. We believe that Congress, in selecting
the preponderance of the evidence phraseology, must have
contemplated some other course.
 The Secretary posits that, under the Act, the 
preponderance standard should be treated as synonymous with the
substantial evidence standard. We think not. Congress appears
deliberately to have refrained from employing the conventional
substantial evidence rule. Courts ordinarily should presume that
Congress legislates with knowledge of the legal standards
prevailing in administrative law. See, e.g., Commissioner v.
Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993). 
Consequently, we are unprepared to say that Congress's election to
use a seemingly different rule in this instance should be thwarted. 
See Haas v. IRS, 48 F.3d 1153, 1156-57 (11th Cir. 1995); cf. BFP v.
Resolution Trust Corp., 511 U.S. 531, 537 (1994) ("It is generally
presumed that Congress acts intentionally and purposely when it
includes particular language in one section of a statute but omits
it in another, and that presumption is even stronger when the
omission entails the replacement of standard legal terminology with
a neologism.") (citation and internal quotation marks omitted).
 Rejecting the Secretary's position establishes what the
phrase ("preponderance of the evidence") does not mean, but leaves
unanswered the question of what it does mean. We are aided in this
inquiry by the fact that the Act's standard of appellate review,
though curious, is not unique: Congress used comparable language
to describe judicial review of factfinding in arbitration
proceedings under the Multiemployer Pension Plan Amendments Act of
1980 (MPPAA), Pub. L. 96-364, 94 Stat. 1208. In relevant part,
that statute's judicial review provision, 29 U.S.C. 1401(c),
states that "there shall be a presumption, rebuttable only by a
clear preponderance of the evidence, that the findings of fact made
by the arbitrator were correct." In construing this provision, the
Seventh Circuit concluded that preponderance of the evidence, when
articulated as a standard of review, operates much the same as the
"clearly erroneous" standard. See Jos. Schlitz Brewing Co. v.
Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994, 998-99 (7th
Cir. 1993); Chicago Truck Drivers Pension Fund v. Louis Zahn Drug
Co., 890 F.2d 1405, 1411 (7th Cir. 1989). The Eleventh Circuit
reached an identical conclusion in respect to the precise provision
at issue here. See Amcor, Inc. v. Brock, 780 F.2d 897, 899 (11th
Cir. 1986). Among its other virtues, such an approach imports a
certain symmetry, as courts regularly review factfinding done
pursuant to a preponderance of the evidence standard for clear
error. See, e.g., Foster-Miller, Inc. v. Babcock & Wilcox Canada,
46 F.3d 138, 147 (1st Cir. 1995); Fed. R. Civ. P. 52(a). We
therefore hold that the Service Contract Act's preponderance of
the evidence standard requires that we review factual findings for
clear error.
 This leaves a further question as to whether deference is
due to the ALJ or the ARB. The Secretary advocates the latter
position. In many settings, that viewpoint would have force. As
a default rule, the Administrative Procedure Act establishes that
an agency enjoys plenary powers of review over a hearing officer's
factual and legal conclusions. See 7 U.S.C. 557(b); see also 2
Davis & Pierce, supra 11.2, at 178-79. Nevertheless, agencies
may elect to deviate from this default rule. See Vercillo v. CFTC,
147 F.3d 548, 553 (7th Cir. 1998); Chen v. GAO, 821 F.2d 732, 737
& n.6 (D.C. Cir. 1987); Mullen v. Bowen, 800 F.2d 535, 541 & n.8
(6th Cir. 1986). Here, the statute and the regulations, read
together, effectuate such a departure.
 The Service Contract Act provides, in relevant part, that
the Secretary or her authorized representative "shall make findings
of fact after notice and hearing, which findings shall be
conclusive upon all agencies of the United States, and if supported
by the preponderance of the evidence, shall be conclusive in any
court of the United States." 41 U.S.C. 39. We think it is
significant that the final clause refers back to the findings of
fact that are made "after notice and hearing." Under the current
administrative structure, those findings of fact are made by the
hearing officer (i.e., the ALJ), not the ARB.
 The regulations further confirm our intuition. They
refer to the ARB as an "appellate body," 29 C.F.R. 8.1(d), and
empower it to "modify or set aside" an ALJ's findings of fact "only
when it determines that those findings are not supported by a
preponderance of the evidence," id. 8.9(b). Given that the
phrase "preponderance of the evidence" is here couched as a
standard of appellate review, we believe that the regulations
contemplate deference to the hearing officer qua factfinder and
require the ARB (like a reviewing court) to accept an ALJ's
factfinding absent clear error.
 Further evidence of the Secretary's intent to limit the
ARB's function to appellate review is found in her refusal to
confer the authority to receive evidence upon the ARB. See id. 
8.1(d). If additional evidence is needed, the ARB must remand to
the hearing officer. See id. Courts have held that the authority
to receive additional evidence customarily signals the power to
reweigh the evidence. See, e.g., Carlisle Area Sch. v. Scott P.,
62 F.3d 520, 528 (3d Cir. 1995). We believe that the converse also
is true: the absence of such authority signals that a reviewing
body's power is limited to error-correction.
 Such a structure of agency review, in which deference is
due to the hearing officer's findings of fact rather than to the
factual determinations of the agency's reviewing body, is unusual,
but not unprecedented. It mirrors, for example the Secretary's
administration of black lung benefits under the Federal Coal Mine
Health and Safety Act, Pub. L. No. 91-173, Title IV, 83 Stat. 792
(Dec. 30, 1969) (codified, as amended, at 30 U.S.C. 901-945). 
The applicable regulations create a framework in which the agency's
reviewing body, the Benefits Review Board (BRB), is enjoined to
employ a substantial evidence standard of review and, thus,
functions under precisely the same constraints as does a reviewing
court. See Consolidation Coal Co. v. McMahon, 77 F.3d 898, 901
(6th Cir. 1996); Taylor v. Alabama By-Products Corp., 862 F.2d
1529, 1532-33 (11th Cir. 1989). Consequently, as long as the ALJ's
findings of fact satisfy the stipulated standard, they are
conclusive upon both the BRB and the courts.
 Based on these insights, we conclude that the ARB is an
appellate tribunal which reviews an ALJ's findings of fact only for
clear error. Accord Amcor, 780 F.2d at 899; see also American
Waste Removal Co. v. Donovan, 748 F.2d 1406, 1408-09 (10th Cir.
1984) ("The findings of fact made by an ALJ in proceedings pursuant
to the Service Contract Act are conclusive in any court of the
United States if supported by a preponderance of the evidence."). 
It is against this backdrop that we assess the ARB's debarment
decision in this matter.
 On the crucial point whether Rioux had raised the
monthly payment question with Dantran during the first
investigation the ARB condemned the ALJ for "erroneously
ignor[ing]" Rioux's testimony. But the ALJ's memorandum opinion
makes it crystal clear that he did not "ignore" the snippet of
testimony that the ARB plucked from the record. The ALJ explicitly
considered the evidence and declined to give it weight, instead
crediting Holmes's testimony that Rioux made no such point. Having
reviewed the entire record, we are persuaded that this finding was
not clearly erroneous especially since the ALJ, not the ARB, had
the opportunity to observe the witnesses' demeanor at first hand.
 To be sure, Rioux testified, albeit somewhat tentatively,
that he had once mentioned to Holmes that the monthly payment
practice violated the regulations. His final report, however, did
not contain a word to that effect. On the contrary, it stated
that, based on employee interviews and perscrutation of payroll
records, the plaintiffs' payroll practices were "in compliance with
all the provisions of the [Act]." Even were the ALJ obliged to
credit Rioux's testimony that he warned the plaintiffs about making
monthly wage payments a dubious supposition, considering a
hearing officer's latitude in making credibility calls, see, e.g.,
Aguilar-Solis v. INS, ___ F.3d ___, ___ (1st Cir. 1999) [No. 98-
1481, slip op. at 11] such a statement could only have been made
informally and, as Rioux himself testified, not in the closing
conference. Given that the compliance officer's final report
exonerated the plaintiffs up and down the line, the ALJ's finding
that Dantran had a reasonable, good-faith belief throughout the
ensuing period that its wage-payment practices conformed with the
Act's requirements was not clearly erroneous.
 In this case, moreover, the ARB's stance is further
weakened because, although it rejected the ALJ's finding of fact,
it never explained why that finding was mistaken. The ARB pointed
to no extrinsic evidence to support its conclusion anent the
plaintiff's lack of good faith and the major piece of relevant
extrinsic evidence (Rioux's final report) supports the ALJ's
credibility determination. On appellate review, courts are
entitled to expect, at a minimum, that an agency which rejects an
ALJ's factfinding will provide a rational exposition of how other
facts or circumstances justify such a course of action. SeeInternational Bhd. of Teamsters v. NLRB, 587 F.2d 1176, 1181 (D.C.
Cir. 1978); Local No. 441, IBEW v. NLRB, 510 F.2d 1274, 1276 (D.C.
Cir. 1975). There is no hint of such an analysis in the ARB's
opinion.
 We have said enough on this score. The short of it is
that, gauged by the proper standard of review, the ARB had no
legally sufficient reason for upsetting the ALJ's findings of fact
(particularly those that relied on credibility assessments).
 At the risk of redundancy, we pause to repastinate ground
previously plowed. The ARB ordered debarment because of the
presence of aggravating factors. It rested this order on two
practices that it deemed culpable: (i) cross-crediting of fringe
benefits, and (ii) payment of wages on a monthly, rather than semi-
monthly, basis. As we have seen, however, the ARB premised the
first of these conclusions on an incorrect view of the law (its
belief that cross-crediting violated the regulations), and it
premised the second on an erroneous rejection of the ALJ's
factfinding. Thus, the ARB's sole remaining rationale for
debarment collapses because its foundation is porous.
 We agree with our dissenting brother that, when a
reviewing court discovers a serious infirmity in agency
decisionmaking, the ordinary course is to remand. See, e.g.,
Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990);
Baystate Altern. Staffing, Inc. v. Herman, 163 F.3d 668, 679 (1st
Cir. 1998). But such a course is not essential if remand will
amount to no more than an empty exercise. See Fergiste v. INS, 138
F.3d 14, 20-21 (1st Cir. 1998); Empire Co. v. OSHRC, 136 F.3d 873,
877 (1st Cir. 1998); Cotton Petroleum Corp. v. United States Dep't
of Interior, 870 F.2d 1515, 1528-29 (10th Cir. 1989). Two
circumstances bring this principle into play. First, the ALJ found
that no aggravating factors were extant, and the record reveals no
plausible basis for a contrary finding. Second, mitigating factors
abound.
 In respect to mitigation, the regulations suggest that
factors such as compliance history, cooperation during the
investigation, and prompt repayment of sums owed bear heavily on
whether relief from debarment should be granted. See 29 C.F.R. 
4.188(b)(3)(ii). Beyond these factors, the agency must consider
items such as the results of previous investigations, the extent to
which the disputed issues involved uncertain legal questions, the
impact of debarment on innocent employees, and the seriousness of
the violations. See id. Here, remand would serve no useful
purpose from a factfinding perspective, for the ALJ already has
made specific findings of historical fact that resolve virtually
all of the enumerated factors in the plaintiffs' favor. Because
these findings easily survive clear-error review, the statute and
the regulations make them conclusive upon the ARB. Consequently,
there is no point in remanding on this account. See, e.g., Freeman
United Coal Min. Co. v. Anderson, 973 F.2d 514, 518 (7th Cir. 1992)
(declining, in black lung benefits case, to remand when the ALJ had
made relevant findings of fact and the court had an obligation to
apply the same standard of review as the agency).
 The only remaining question is whether we should remand
so that the ARB can review the mitigating factors to determine the
supportability of the ALJ's balancing (i.e., his application of
legal standards to the facts as found). Were evidence of
aggravation present, or were mitigation evidence lacking, or were
the relevant proof meager, we would not hesitate to remand for the
ARB's reconsideration. Here, however, there is no reasonable doubt
about the balancing equation's overall equilibrium. Although the
Act grants the Secretary latitude in considering whether to
recommend relief from debarment, she has cabined that discretion by
enumerating the specific factors (and the balancing methodology)
upon which she will rely to determine the existence of unusual
circumstances. In this case, the findings as to mitigation are so
potent that solving the balancing equation in any manner contrary
to that which the ALJ reached would constitute an abuse of
discretion. Furthermore, while we do not regard the Secretary's
list of enumerated factors as exhaustive, neither the ARB's opinion
nor the Secretary's brief so much as hints at any other datum in
the record that might alter the outcome of the mitigation equation.
 In the last analysis, the Secretary's only plausible
argument for remand emphasizes that the plaintiffs' transgressions
did not involve legal issues of "doubtful certainty." To the
extent that this argument refers to cross-crediting, it is simply
wrong. See supra Part II. To the extent that it refers to the
frequency of payment issue, the argument has some bite, but for two
reasons we do not believe, as a matter of law, that the Secretary's
"legal certainty" refrain can prevail.
 For one thing, the fact that the Secretary's own
representative failed to advise the plaintiffs during the 1989
investigation that their wage-payment practices were impermissible
undermines her position. As we have said, Rioux's final report
left the plaintiffs with the justifiable impression that the
monthly payment of wages met the Secretary's criteria. This
impression was bolstered both before and after that investigation
by the conduct of various Postal Service officials, who contracted
to pay Dantran monthly, accepted the plaintiffs' submission of
payroll schedules that clearly showed monthly payments without
evincing the slightest concern, and assured the plaintiffs
(tacitly, at least) that they were handling employee payments in an
appropriate manner. While these facts do not warrant estoppel
against the government, see supra Part III, they nevertheless form
a significant part of the equitable overlay that the Act and the
regulations take into account in determining whether relief from a
very harsh penalty is warranted.
 For another thing, the legal certainty associated with
the payment frequency provision, without more, cannot overcome a
record that reeks of mitigation. This solitary item cannot trump
the numerous indicia of mitigation contained in the record (most of
which satisfy precisely the specific mitigating criteria limned by
the regulations). Thus, given the absence of aggravating
circumstances, the prevalence of mitigating factors, and the
relatively insubstantial nature of the violation, debarment would
be a punishment totally out of proportion to the offense (and,
therefore, contrary to the regulations). See 29 C.F.R. 
4.188(b)(2).
 We summarize succinctly. The customary rule, as our
dissenting brother says, favors remand when a court sets aside an
agency determination. But the rule also allows some flexibility. 
Courts should not indulge in wasteful wheel-spinning. Thus, in the
rare case in which the facts admit of only one plausible legal
conclusion, an inquiring court serves the ends of justice by a
frank acknowledgment that remand promises to be an exercise in
futility. See Gatson v. Bowen, 838 F.2d 442, 450 (10th Cir. 1988)
(declining to remand after concluding that agency had misapplied
the law where, regardless of any further findings, the record would
support only one legal conclusion); Brock v. L.R. Willson & Sons,
Inc., 773 F.2d 1377, 1389 n.12 (D.C. Cir. 1985) (concluding that
the court of appeals could rule on a question involving application
of law to fact, without remanding to the agency, as long as only
one conclusion would be supportable); Donovan ex. rel. Anderson v.
Stafford Constr. Co., 732 F.2d 954, 961 (D.C. Cir. 1984) (same);
see also Donovan v. Capital City Excavating Co., 712 F.2d 1008,
1010 (6th Cir. 1983); Usery v. Marquette Cement Mfg. Co., 568 F.2d
902, 910-11 (2d Cir. 1977). Because this is such a case after
all, debarment proceedings under the Act are all-or-nothing
propositions, see Federal Food Serv., Inc. v. Donovan, 658 F.2d
830, 834 (D.C. Cir. 1981); no intermediate penalties are available,
so if debarment is not in order, no practical necessity exists for
resurrecting the administrative proceeding remand is not
obligatory.
V. CONCLUSION
 We need go no further. Although the plaintiffs did
violate the Act in one particular, they have made a compelling case
for relief from debarment. In view of that conclusion, and because
remand is not an appealing option, we rescind the debarment order,
reverse the decision of the district court, and return the case to
that court for the entry of an appropriate judgment.

Reversed.

 Separate Opinion follows CUDAHY, Senior Circuit Judge, concurring in part and dissenting in
part.
 With some reluctance, I undertake a critique of Judge
Selya's monumental analysis of this tangled case. But in several
respects I think a different approach may be required.
 Before reaching the more troubling question, I generally
approve of the direction taken by the majority's dissection of the
fringe benefit provisions. However, I do not come away from this
examination entirely convinced that the Department's reading of its
regulations is wrong and Dantran's is right. As far as it goes,
the majority's analysis is persuasive. That analysis does not,
however, fully account for the use of terms like "contract-by-
contract," "employees performing on more than one contract," "on
each contract" and the like. The regulations, particularly the
latter pertinent sentence of 29 C.F.R. 4.172, emphasize a need
to calculate fringe benefits as separately attributable to specific
contracts. It is not a complete answer to suggest, as does the
majority, that this language is designed merely to mandate
accounting for all of the hours worked on the various contracts in
order to make up the allowed forty hours. If this were all that
was involved, why would the regulations specify that the
calculation be made "contract-by-contract?" The emphasis is too
insistent, it seems to me, merely to convey the meaning suggested
by the majority.
 I believe that the language that I have quoted above does
tend to support the Department's position. However, reading this
language together with the other language which the majority
opinion correctly analyzes as supporting Dantran's view, the only
fair conclusion is that these regulations are self-contradictory
and too vague and ambiguous to be enforced. One reason for this is
that the Department has not seen fit to explain to us the rationale
for its reading of the rule. One would think that, for example,
fifty hours worked under several contracts should be rewarded with
the same fringe benefits as fifty hours worked under a single
contract, as Dantran has interpreted the regulations. It may be,
giving maximum ambit to one's imagination, that somehow two
contracts provide more funds to cover fringe benefits than does a
single contract. We can hardly be expected to speculate that this
is the case, however. The best we can do is leave the subject
scratching our heads and concluding that the regulations are
indecipherable. If that is the case, they are unenforceable. They
cannot furnish any basis for an order of debarment. 
 On the other matter in dispute -- the frequency of wage
payments -- I part company in a significant way with the majority. 
The record here does not reflect any good reason why an employer,
exercising normal prudence, is entitled to assume, without
checking, that monthly payment of wages is an available option or
that the applicable regulations would endorse this practice. This
is not an esoteric matter, like the methodology of furnishing
fringe benefits. Instead, it is easily understood and likely to be
of immediate concern to employees. It is something about which a
prudent employer would take reasonable steps to acquaint himself --
even to the point of actually looking at the regulations.
 In that connection, did Dantran make any effort between
1986 (when it apparently began monthly payments) and 1991 to ensure
compliance with the frequency of payment provisions? It appears
not. Holmes testified that he spoke with his Post Office contacts
about the propriety of cross-crediting fringe benefits, but he
never mentioned asking how often he was required to pay his
employees. His wife, who kept Dantran's books and ran its payroll,
was similarly remiss. The majority does not even note this major
omission but apparently adopts Dantran's thesis that if the
contract specifies monthly payments to Dantran by the government,
Dantran is entitled to infer that Dantran's employees need be paid
only monthly. See ante at 23. This seems specious to me. 
Although Dantran apparently did not keep large cash reserves, it
ought to have better access to working capital than its employees. 
Dantran is in a better position to adjust for temporary mismatches
of revenue and expense than are its employees to wait a full month
for their pay. Contractors and merchants the world around receive
progress payments, remittances on invoices and other payments from
customers on a variety of schedules, but I am not aware that these
schedules determine how often they are expected or required to pay
their own employees. This inference, for which Dantran argues
persistently, is simply a non-sequitur. And I know no reason why
government contractors would have some special dispensation to pay
their employees less frequently than businessmen in the economy at
large.
 I am therefore not nearly as indulgent of Dantran's
frequency of pay practices as is the majority. On the other hand,
I am certainly not convinced that debarment is appropriate. I
believe the matter of frequency of wage payments should be remanded
to the Board for separate consideration, the fringe benefit matter
having dropped out of the case.
 Remand would clearly not be an empty exercise. 
Notwithstanding the majority's apparent effort to consign the Board
to irrelevance, the Board does -- and should -- retain some
discretion to determine whether debarment is warranted. The plain
language of 41 U.S.C. 39 -- "findings of fact . . . shall be
conclusive upon all agencies of the United States, and if supported
by the preponderance of the evidence, shall be conclusive in any
court of the United States" -- suggests that reviewing bodies may
exercise what amounts to de novo review of the record. If the
finder of fact and the reviewing authority are bound by the same
standard in establishing the facts (preponderance of the evidence),
the logic of the situation is that review is essentially de novo. 
First Circuit case law apparently supports such a literal reading.
See Vigilantes, Inc. v. Administrator of Wage & Hour Div., 968 F.2d
1412, 1418 (1st Cir. 1992) ("We review the Secretary's findings to
determine whether a preponderance of the evidence supports his
conclusion that [the appellants] should be barred from bidding on
government contracts."). The Eleventh Circuit case cited by the
majority, Amcor, Inc. v. Brock, 780 F.2d 897, 899 (11th Cir. 1986),
at best only stirs up already murky waters by mentioning "clear
error" and "preponderance of the evidence" in consecutive
sentences. 
 In addition, the majority's reliance on interpretations
of the MPPAA is misplaced, since that statute frames the standard
of review more conventionally: "there shall be a presumption,
rebuttable only by a clear preponderance of the evidence, that the
findings of fact made by the arbitrator were correct," 29 U.S.C.
 1401(c) (emphasis added). This language simply establishes a
presumption in favor of the factfinder (something like the clear
error standard). This is quite different than the language of 41
U.S.C. 39 (governing this case) which establishes no such
presumption but instead instructs the reviewing body to accept
findings only if they are supported by a preponderance of the
evidence.
 Moreover, even though the Secretary's own regulations
appear to vest the Board with essentially appellate powers,
appellate bodies need defer, if they are to defer at all, only to
findings of historical fact; how the law applies to the facts is
certainly within the de novo reviewing powers of the appellate
body. The majority offers no reasons why we would defer to the
ALJ's application of the law to the facts rather than accept the
same application by the Board.
 I therefore disagree with the majority about the degree
of deference in factual matters the Board owes to the ALJ. But
these differences are not crucial in resolving the question of
debarment, since relief from debarment does not issue automatically
from determinations of fact. Instead, as prescribed by the
regulations, the absence of aggravating circumstances, the presence
of mitigating elements and a sensitive balancing of related factors
(potentially either aggravating or mitigating) determines whether
a case presents truly unusual circumstances. An adjudicator must
address, for example, a contractor's efforts to ensure compliance
and a contractor's culpability, if any, in failing to make the
necessary efforts. None of these determinations simply requires
findings of fact; each requires a judgment about how the facts
relate to the legal standards set out in the regulations. 
Ultimately, there must be a discretionary judgment about the
relative weight to be accorded each factor.
 Again, with respect to Dantran's efforts at compliance,
the majority is persuaded that inspector Rioux's "clean bill of
health" provides some sort of "equitable overlay," see ante at 36-
37, excusing Dantran's failure to inquire about or read the
applicable regulations. I do not find this convincing. At the
same time, the majority goes to considerable lengths to reject
Dantran's estoppel argument. It follows from this emphatic denial
of estoppel that any reliance by Dantran on Rioux's report to
justify its own breach of regulations is unreasonable. In that
context, it is not clear why fairness requires us to credit
Dantran's mistaken beliefs.
 In my view, equitable considerations of whatever sort are
better left in the first instance to the Board, precisely because
the regulations mandate a factor-specific balancing with
accompanying judgments about the relative weights of the factors. 
The present case illustrates the potential for competing inferences
and varying weights to be attached to findings of historical fact. 
Thus, even if the Secretary must review the ALJ's fact-finding with
deference, she must still make an independent determination whether
the facts add up to circumstances unusual enough for Dantran to
avoid debarment. I would permit the Secretary or her delegate, the
Board, to undertake this balancing anew, consistent with this
opinion, of course. To that extent, I respectfully dissent.